Sabrina YONKO, Appellant,

v.

**DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES,**
Appellee.

No. 01–05–00091–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

April 27, 2006.

William B. Connolly, William B. Connolly & Associates, Houston, for appellant.

Sandra D. Hachem, Sr. Asst. Co. Atty., Houston, for appellee.

Panel consists of Chief Justice RADACK and Justices ALCALA and BLAND.

## OPINION ON REHEARING

JANE BLAND, Justice.

■ Sabrina Yonko appeals the trial court's judgment terminating her parental rights to her minor son ("V.Y."). Yonko contends the evidence is legally and factually insufficient to support the trial court's findings that (1) she knowingly allowed the child to remain in conditions which endangered the child's physical or emotional well-being; (2) she knowingly placed the child with persons who engaged in conduct which endangered the child's physical or emotional well-being; (3) she was the major cause of the child's failure to be enrolled in school as required by the Education Code; and (4) it is in the child's best interest for Yonko's parental rights to be terminated. In our opinion dated December 22, 2005, we held that the evidence was factually insufficient to support the trial court's finding as to issue four and therefore we reversed and remanded for a new trial. The State has filed a motion for rehearing and motion for rehearing en banc. We withdraw our previous opinion and issue this opinion in its stead.[1] Our disposition remains the same.

### Facts

After having been raped at age seventeen, Yonko gave birth to V.Y. in August 1995. In 1996, Yonko began a relationship with Sam Perez ("Perez"), the man whom Yonko later came to consider her husband and V.Y.'s father. Yonko testified that their families did not approve of their relationship and, to put it mildly, did not get along with each other. She testified that in one incident, her father went to jail and Perez's father went to the hospital after the two men had a fight, and in another, Perez's father showed up at her father's

house with gang members and guns. As a result, Yonko and Perez traveled wherever they thought they could find work and avoid problems with their families. She further testified that V.Y. never witnessed any of the violence between their families. Yonko estimated that during V.Y.'s childhood, they spent about a year to a year and a half in San Diego, a month to a month and a half in Las Vegas, four months in Phoenix, a couple months in Detroit, a couple months in Houston, two years in Chicago, and a couple months in Hammond, Indiana. Yonko stayed either in motels or with family members, and V.Y. was with Yonko at all times during this period. Yonko never enrolled V.Y. in school. During this period, Yonko worked as an auto body repair technician, and sold potpourri and roses at flea markets. She at all times was gainfully employed.

During one visit to Houston in March 2002, Yonko was arrested and charged with aggravated assault. Yonko testified that Perez was responsible for the assault, which was committed against a third person, but that she pled guilty in an effort to avoid imprisonment. The criminal trial court sentenced Yonko to three years' community supervision. She left Harris County soon thereafter to visit her grandfather, who she claimed was having heart surgery. As a result, the court revoked Yonko's community supervision, and sentenced her to two years' imprisonment. At this time, V.Y. was six years' old. Upon her incarceration, Yonko placed V.Y. in her mother's care. Yonko testified that she believed her brother ("Angelo") and his wife would also help her mother ("Betty") take care of V.Y. Yonko gave Betty $4,400, which she had saved from working, to care for V.Y. and to pay for an attorney.

---

1. As we have issued a new opinion on rehearing, we deny the State's motion for en banc reconsideration as moot. See *Brookshire Bros. v. Smith,* 176 S.W.3d 30, 40 n. 2 (Tex. App.-Houston [1st Dist.] 2004, pet. denied) (supp. op. on reh'g).

In May 2004, the Department of Family and Protective Services ("DFPS") received a referral of neglectful supervision of V.Y. when he was found taking cookies from an apartment complex leasing office. V.Y. told police he had been staying with his maternal uncle, Angelo, in the complex, and that his mother and father were on vacation in Las Vegas. Apartment personnel told police that the padlocked apartment where V.Y. claimed he had been living had not been occupied by Angelo, and that no one named "Yonko" occupied any apartment in the complex or in the surrounding area. DFPS observed that V.Y.'s clothing was dirty and torn, and that he had dirt caked in his nails, and took him into custody. Although he was eight years old, V.Y. could not write his name, nor could he identify much of the alphabet and some numbers.

A week later, Angelo contacted DFPS and provided inconsistent stories about why V.Y. was in his care. Angelo claimed V.Y. had been staying with Perez in Arizona, and that he went to get V.Y. in October 2003, but the DFPS caseworker testified that she had some concerns about Angelo's honesty. After performing a home study, DFPS determined that V.Y. should not live with Angelo because Angelo had been evicted in the past; V.Y. was seen roaming the streets at one o'clock in the morning; V.Y. shot someone's window out with a BB gun while in Angelo's care; Angelo could not produce proof of income; Angelo and his wife already had two children with a third on the way; and Angelo's wife told DFPS that V.Y. would not follow her instructions.

Yonko learned that her son was in DFPS's custody from a social worker, and was then served in prison with the lawsuit to terminate her rights. Yonko testified that she was shocked by what happened to V.Y. because Betty, Yonko's mother, loved V.Y. as much as she did, and she did not know the reason for Angelo leaving V.Y. unsupervised. Upon learning about V.Y., Yonko had a "nervous breakdown," meaning she started shaking, would not eat, and had to be put on medication for a period of time. Yonko wrote approximately 200 letters to V.Y. after she learned what had happened. V.Y. wrote her back six or seven times. After being served, Yonko wrote numerous letters to the district and county court clerks requesting an attorney. The trial court appointed counsel for Yonko approximately one month before trial.

In accordance with the family service plan created for her by DFPS, Yonko completed classes in prison on parenting, anger management, and life skills, and participated in counseling. Yonko testified that upon her release from prison, scheduled to occur in less than thirty days after the trial of this case, she would find employment, enroll V.Y. in school, and establish suitable housing. She testified that she had learned the importance of an education, exemplified by her earning her G.E.D. in prison, and that she regretted not enrolling V.Y. in school when he became eligible. Yonko testified that she believed it was a responsible decision to leave V.Y. with Betty because Betty was his grandmother and loved him. Betty herself was not available to testify because, according to the guardian ad litem's testimony, Yonko believed Betty was living in California at the time of the trial.

The DFPS caseworker testified that she believed termination was in V.Y.'s best interest, but admitted that V.Y. had expressed a strong preference to be with his mother. The caseworker opined that V.Y. would be "heartbroken" if his mother's rights were terminated and would need counseling to support him if the court permanently separated him from his mother. The guardian ad litem supported termi-

nation based on reading reports, meeting with the foster parents, and meeting V.Y. The guardian ad litem also testified that she met with Yonko for forty-five minutes in jail, and that Yonko was cooperative in providing information. The attorney ad litem opposed termination, stating that it would be in V.Y.'s best interest to remain in contact with Yonko and that she believed V.Y. would suffer permanent damage if not allowed to remain in contact with his mother. The trial court terminated Yonko's rights and appointed DFPS the sole managing conservator.

## Standard of Review

The natural right that exists between parents and their children is one of constitutional dimension. *See In re J.F.C.*, 96 S.W.3d 256, 273 (Tex.2002) (examining constitutional implications of terminating parental rights). A parent's right to "the companionship, care, custody and management of his or her children" is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982) (quoting *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972)). In a case terminating parental rights, therefore, we strictly scrutinize the proceedings and strictly construe the law in favor of the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). In proceedings brought under section 161.001 of the Family Code, the petitioner must establish one or more of the acts or omissions enumerated under subdivision (1) of the statute and must also prove that termination is in the best interest of the child. TEX. FAM.CODE ANN. § 161.001 (Vernon 2005); *In re J.L.*, 163 S.W.3d 79, 84 (Tex.2005); *In re L.M.*, 104

S.W.3d 642, 647 (Tex.App.-Houston [1st Dist.] 2003, no pet.).

In termination of parental rights cases, "due process requires that the State support its allegations by at least clear and convincing evidence" to reduce the risk of erroneous termination. *Santosky*, 455 U.S. at 747–48, 102 S.Ct. at 1391–92; *In re B.L.D.*, 113 S.W.3d 340, 353–54 (Tex.2003). To be legally or factually sufficient under the clear and convincing standard, the evidence must be such that a fact-finder reasonably could form a firm belief or conviction about the truth of the matter on which the State bears the burden of proof. *In re J.L.*, 163 S.W.3d at 84; *Robinson v. Tex. Dep't of Protective & Regulatory Servs.*, 89 S.W.3d 679, 688 (Tex.App.-Houston [1st Dist.] 2002, no pet.).

In a legal sufficiency challenge, we review all the evidence in a light most favorable to the court's finding, and assume the fact-finder resolved disputed facts in favor of its finding if a reasonable fact-finder could do so. *In re J.L.*, 163 S.W.3d at 85. We disregard any evidence that a reasonable fact-finder could have disbelieved, but we do not disregard undisputed facts. *Id.* In reviewing a challenge to the factual sufficiency of the evidence, we must give due consideration to the evidence that the fact-finder reasonably could have found to be clear and convincing, considering all the evidence in the record, including evidence in support of and contrary to the trial court's findings. *In re J.F.C.*, 96 S.W.3d at 266. In reviewing all the evidence, we also keep in mind that the State has the burden of proof in termination proceedings. *See id.* at 264.

## Legal Sufficiency[2]

The trial court found that clear and convincing evidence existed to termi-

---

**2.** When both legal and factual sufficiency issues are raised, we decide the legal sufficien-

cy issue first. *Glover v. Tex. Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex.1981).

nate Yonko's parental rights under Family Code section 161.001(1)(D), because she knowingly placed the child in conditions which endangered his physical and emotional well-being; under section 161.001(1)(E), because she engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered his physical and emotional well-being; and under section 161.001(1)(J)(i), because she had been the major cause of the failure of the child to be enrolled in school as required by the Education Code. *See* TEX. FAM.CODE ANN. § 161.001. The trial court further found, as required by the statute, that clear and convincing evidence existed that termination was in the best interest of the child. *See id.* Yonko challenges the legal sufficiency of each of these findings.

 Though the trial court here found that termination was justified under all three of the enumerated factors alleged by DFPS, and that termination was in V.Y.'s best interest, a finding of one enumerated factor coupled with a finding of the child's best interest is sufficient to support termination. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex.2003) ("Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest."); *see also Latham v. Dep't of Family & Protective Servs.*, 177 S.W.3d 341, 348 (Tex.App.-Houston [1st Dist.] Apr. 7, 2005, no pet.) ("A court may base a termination of parental rights upon a finding that a parent engaged in conduct described in one of the alleged grounds, plus a finding that termination is in the best interest of the children."). A finding that the termination was not in the child's best interest is enough to justify reversal, even if all of the enumerated factors are proven. *See In re A.V.*, 113 S.W.3d at 362. We hold

that the evidence was legally sufficient to support termination under one enumerated factor and the child's best interest, but factually insufficient to support termination based on the child's best interest. Thus, we address the evidence supporting the enumerated factor and best interest.

### Failure to Enroll the Child in School

 The trial court found termination of Yonko's parental rights justified under section 161.001(1)(J), because Yonko had been the major cause of "the failure of [V.Y.] to be enrolled in school as required by the Education Code." *See* TEX. FAM. CODE ANN. § 161.001(1)(J). The Education Code provides that "a child who is at least six years of age ... shall attend school." TEX. EDUC.CODE ANN. § 25.085(b) (Vernon Supp.2005).

Yonko admits that she never enrolled V.Y. in school or otherwise provided him with a certified home-school education, noting that she was molested while in school, and that she was not settled enough to enroll V.Y. in school. Yonko further contends that she and V.Y. were never Texas residents for any relevant time period under the statute. The State responds that Yonko was in Harris County for approximately two months around the time she was charged with assault in March 2002, and that V.Y. was age six at that time.

The compulsory education statute does not state a residency requirement, and the caselaw indicates that moving frequently does not exempt a parent from the requirement of enrolling a child in school or otherwise providing for his education. Yonko argues that viewing the Education Code as a whole, residency is a requirement of enrollment. *See id.* § 25.001(b)(1) (requiring schools to admit children between ages five and twenty-one if they reside in school district); *id.* § 25.001(c)

(allowing districts to set minimum proof of residency before admitting children). Yonko ignores, however, the many other situations where the statute requires schools to admit children who are non-residents. For example, the statute requires admission to school if the child is living with a parent who has joint custody, if the person is homeless regardless of residence, if the person is a foreign exchange student, or if the child is temporarily living with foster parents. *Id.* § 25.001(b)(2), (5), (6), (f). In *Stuart v. Tarrant County Child Welfare Unit*, the court of appeals held that the parents' need to move frequently in the flea market circuit so they could support the family did not excuse them from the requirements of the compulsory education statute. 677 S.W.2d 273, 280 (Tex.App.-Fort Worth 1984, writ ref'd n.r.e.), *overruled on other grounds by In the Interest of W.S.*, 899 S.W.2d 772 (Tex.App.-Fort Worth 1995, no writ). Viewing the evidence in this case in a light most favorable to the ruling, the trial court reasonably could have formed a firm belief or conviction that Yonko was the major cause of failing to enroll V.Y. in school as required by the Education Code.

*Best Interest of the Child*

The Texas Supreme Court has provided a non-exclusive list of factors that may be considered in determining whether the termination of a parent's rights is in a child's best interest. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex.1976). These factors include (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not proper, and (9) any excuse for the acts or omissions of the parent. *Id.*

The State need not prove all of the *Holley* factors as a condition precedent to parental termination. *In re C.H.*, 89 S.W.3d 17, 27 (Tex.2002). Undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child, but the presence of scant evidence relevant to each *Holley* factor will not support such a finding. *Id.; In re J.J.O.*, 131 S.W.3d 618, 630–31 (Tex.App.-Fort Worth 2004, no pet.). There is a strong presumption that the best interest of the child is served by keeping custody in the natural parent. *In re B.M.R.*, 84 S.W.3d 814, 819 (Tex.App.-Houston [1st Dist.] 2002, no pet.). For legal sufficiency purposes, we will consider those factors that support the finding that termination was in the child's best interest. *In re C.T.E.*, 95 S.W.3d 462, 464 (Tex.App.-Houston [1st Dist.] 2002, pet. denied). The evidence raises two *Holley* factors supporting termination.

*1. Parent's Acts or Omissions*

The evidence is undisputed that Yonko failed to enroll V.Y. in school or otherwise provide a certified home-school education. The DFPS caseworker testified that when V.Y. came into State custody, he could not recognize many letters and some numbers, and he was unable to read, write, and do arithmetic. The school he began attending placed V.Y. one grade level behind, and required him to participate in one-on-one pull-out groups for individual attention. Yonko admits that it was not in V.Y.'s best interest for him never to have been placed in school. Viewing the evidence in a light most favorable to the ruling, the trial

judge could have formed a firm belief or conviction that Yonko's failure to enroll V.Y. in school or teach him to read or do math weighed in favor of termination of Yonko's rights.

In addition, Yonko's participation in an aggravated assault and subsequent violation of community supervision weigh against Yonko on this issue. Though Yonko testified that she was not responsible for the assault, a reasonable fact-finder could have disbelieved this testimony. Yonko also testified that she violated her community supervision to be with a sick grandfather, but she nonetheless knowingly violated her community supervision by leaving Harris County. This factor weighs in favor of termination.

### 2. Stability of the Home

The State also contends that termination is in V.Y.'s best interest because he lived in many locales before the age of six. The evidence is undisputed that Yonko moved frequently when V.Y. was in her care. Though Yonko was inconsistent in her estimation of the time they resided in each place, they had spent at least some time in San Diego, Las Vegas, Phoenix, Houston, Chicago, Detroit, and Hammond, Indiana, all by the time V.Y. was seven years' old. As to V.Y.'s current home environment, the DFPS caseworker testified that V.Y. had bonded with his current foster family, the second family with whom DFPS has placed him for care. We hold that legally sufficient evidence supports the trial court's finding of best interest under this factor because in this case Yonko failed to provide for V.Y.'s educational needs, but we decline to hold that moving alone is tantamount to instability in the home if the child's other social, emotional, health, and educational needs are met.

### Factual Sufficiency

■■■■ Next, we balance the factors presented in the legal sufficiency argu-

ment against the evidence that militates against finding that termination is justified under the statute. *In re C.T.E.*, 95 S.W.3d at 464. A court of appeals should consider whether disputed evidence is such that a reasonable fact-finder could not have resolved that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. If, in light of the entire record, the disputed evidence that weighs against termination is so significant that a fact-finder could not reasonably have formed a firm belief or conviction that termination was justified, then the evidence is factually insufficient to support termination. *Id.* A court of appeals should detail in its opinion why it has concluded that a reasonable fact-finder could not have credited disputed evidence in favor of termination. *Id.* at 266–67.

### 1. Child's Desires

The evidence is undisputed that V.Y. loves his mother and wishes to live with her. Yonko testified that V.Y. "would go crazy" if her rights were terminated because he is expecting to re-unite with her. The DFPS caseworker testified that V.Y. loves his mother and would be "heartbroken" if he never got to see her again. The caseworker further testified that V.Y. would need counseling to recover from the separation. V.Y. expressed his feelings toward his mother in one of the letters he sent her after he was taken into DFPS custody:

> Dear Mom, I love you forever I pray every night. Mom send a couple of pictures of you am writing to you soon. I miss you mom. I pray every night even when I eat. I hope I see you again. I hope you like the pictures I gave you. I miss you mom. Love [V.] forever from your son [V.]

The DFPS caseworker also testified that V.Y. told her he loves his mother and

misses her, and that a bond exists between him and his mother.

■ The State points to *In re W.S.M.*, 107 S.W.3d 772 (Tex.App.-Texarkana 2003, no pet.), for the proposition that a child's love for his parents cannot override undisputed evidence that the parents' lifestyle endangers the child's well-being. We agree that the child's desire to remain with a parent is only one factor to consider among many, but love for a parent cannot be ignored as a reflection of the parent's ability to provide for the child's emotional needs. Where the evidence of the parent's failures is not overwhelming, the desires of the child weigh against termination of parental rights.

The facts of this case are easily distinguishable from the facts of *W.S.M.* There, the evidence showed that the father was physically abusive to the mother; the parents were unable to provide financially for the family; both parents engaged in extensive drug use; at age seven, the child did not know how to clean himself after using the restroom or how to tie his shoes; the mother had neglected a health problem until it was so bad the child needed surgery; the mother suffered from depression; and DFPS had intervened to try to help the family before, but both parents refused to complete the family plan. *Id.* at 773.

Here, in contrast, the evidence indicates that Perez was never violent toward Yonko or V.Y.; Yonko provided financially for the family, sometimes earning as much as $600 in a day repairing cars; and the only evidence of drug use occurred before Yonko became pregnant with V.Y., many years before the termination proceeding. No evidence exists that Yonko ever failed to provide for V.Y.'s medical needs. Yonko completed all the required classes under the DFPS family supervision plan and earned her G.E.D. Moreover, Yonko

placed V.Y. in her mother's care, together with $4,400 to defray expenses for V.Y. and her criminal attorney. While separated from Yonko, V.Y. experienced problems following directions, took cookies from an apartment complex leasing office, and shot a BB gun through a window, but this evidence does not rise to the level that establishes that Yonko's lifestyle endangered the child as compared to the circumstances in *W.S.M. See id.*

Here, V.Y. was nine years' old at the time of the trial and capable of expressing his love for, and desire to remain with, his mother. V.Y. expressed this desire through letters to his mother and statements to the DFPS caseworker. His mother returned this affection in nearly 200 letters sent to him while she was incarcerated. Combined with the DFPS caseworker's admission that V.Y. would be so affected by termination as to be heartbroken and would require counseling, this factor of the "child's desires" weighs against a finding that termination was in V.Y.'s best interest.

*2. Emotional and Physical Needs of the Child Now and in the Future*

The evidence indicates that Yonko provided for the physical and emotional needs of V.Y. before her incarceration. Yonko testified that she provided V.Y. food, clothing, shelter, and love while he was in her care. This evidence is undisputed. V.Y.'s love for his mother and desire to be with her further indicate that she was providing for his emotional needs, and that his emotional well-being in the future is dependent upon maintaining a relationship with his mother. Yonko testified that she has always been employed, and can make anywhere from $100 to $600 a day repairing cars. She has also made money selling potpourri and roses, and was able to save $4,400 which she intended to use to rent an apartment and purchase a more reliable

car. DFPS put on no evidence to indicate that Yonko herself had ever failed to provide for the physical or emotional needs of her child. Rather, that evidence relates to the lack of care V.Y. received from relatives after Yonko's incarceration.

Although it is undisputed that Yonko left her son in the care of her mother, together with $4,400 she had saved, the State contends that the trial court was within its discretion to believe that the money was for an attorney rather than V.Y. because Yonko initially testified that she had not provided financial support for V.Y. The State, however, mischaracterizes the testimony on this issue. While Yonko was questioned by the State regarding the arrangements she made for V.Y.'s care while she was in prison, the State asked with whom she had left her son. Yonko responded that her mother, brother, and sister-in-law would all be taking care of him. The State next asked whether she provided her family members with any financial support for the child. Yonko responded that she was in prison and thus could not send them money. The State then asked Yonko whether she had saved any money prior to becoming incarcerated, to which she replied that she had saved $4,400, which she had intended to use to rent an apartment and purchase a better car. The State asked whether she turned that money over to her mother for the care of V.Y. and she responded that she had. The State asked whether the money was used on V.Y.'s behalf. Yonko stated that it was supposed to be. The State then stated that the question was whether Yonko knew that the money was spent on her son's behalf. Yonko responded that she was pretty sure it was. This testimony does not indicate that Yonko initially denied leaving the money for the care of her son; rather, it indicates that Yonko believed the question was whether she had sent money since becoming incarcerated, to which Yonko honestly replied that she had not. The State's own questions indicate that the State knew Yonko had left money, and was attempting to clarify this issue for the court.

The evidence suggesting that Yonko did not provide for V.Y. comes from the period while Yonko was incarcerated. The DFPS caseworker admitted Yonko could not know that Yonko's mother would not care for her son. The DFPS caseworker also testified that she had doubts about Angelo's story that he picked V.Y. up from Arizona where he was staying with his father. Yonko testified that she was shocked to discover that her family failed to properly care for V.Y. Furthermore, the evidence is undisputed that Yonko sent over 200 letters to V.Y. during the time he was in DFPS care, assuring him that she loved him and they would be together again soon.

Yonko threatened V.Y.'s needs when she violated her community supervision, thus resulting in incarceration. The Texas Supreme Court has held, however, that incarceration alone is not a sufficient basis for termination of parental rights. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex.1987). Yonko was scheduled to be released from prison within thirty days of this trial, and repeatedly expressed her intentions to secure a job and an apartment, and enroll V.Y. in school, thus indicating that she did not intend to repeat her mistakes in the future. Yonko also completed classes in anger management and parenting, and completed her G.E.D. while in prison, further indicating she would be able to provide for V.Y.'s needs. We hold that this factor weighs against termination, given the caseworker's assessment of V.Y.'s emotional need for his mother, and the lack of evidence from the State as to emotional or physical abuse or neglect by the mother.

*3. Emotional and Physical Danger to the Child Now and in the Future*

The only evidence of any potential danger to V.Y. was from Yonko's stepfather. Yonko testified that her stepfather was abusive to her mother, Betty, when she was a child, that V.Y. had seen Yonko's stepfather spill whiskey on Betty, and that Betty was unable to testify at this trial because she fled to California when her husband threatened to kill her. Yonko testified that they lived with her mother for less than a month when V.Y. was a child, and that she left V.Y. with Betty when she went to prison. The State contends that V.Y. was therefore exposed to potential family violence. However, the State does not dispute Yonko's testimony that Betty always either called the police or left when her husband was violent. Nor does the State dispute Yonko's testimony that she told her mother to get a restraining order, and that something would have to be done about the situation with her stepfather before she would bring V.Y. around Betty. Yonko also testified that she changed residences to protect V.Y. from her stepfather and avoid any violent situations. This evidence indicates that Yonko and Betty took steps to avoid potential violence by the stepfather, and to keep V.Y. away from such violence.

In addition, the evidence indicates that emotional harm to V.Y. would result if Yonko's parental rights were terminated. The DFPS caseworker testified V.Y. would need counseling to overcome the separation, and that he would be heartbroken. Yonko testified that V.Y. would go crazy because she had been assuring him in her letters that they would be together again soon. The attorney ad litem appointed to represent V.Y. also opposed termination because of the negative emotional impact she believed it would have on V.Y. Given the lack of evidence of any physical or emotional endangerment to V.Y. while in his mother's care, a reasonable fact-finder could not have formed a firm belief that emotional or physical danger to the child would result from allowing Yonko to retain rights to her son.

*4. Parental Abilities of the Individual Seeking Custody*

Yonko's failure to enroll V.Y. in school for the one-year period during which he was in her care and required to attend school, and Yonko's frequent moves, cause concern for her parental abilities. Also, Yonko's testimony that she occasionally had others read legal documents for her or write things to be submitted to DFPS indicates that she might have a difficult time helping V.Y. with his school work. Yonko testified that she did not attend school very often as a child. Yonko also testified that she learned the value of education in prison, and that she pursued and completed her G.E.D. In addition to her G.E.D. classes, Yonko took classes on parenting, life skills, anger management, and bible studies. Yonko testified that she intended to put V.Y. in school, and that she wanted him to be a lawyer or a pastor. The DFPS caseworker testified that V.Y.'s only special need was reading, and recognized that within a few months of being in custody, V.Y. was writing letters to his mother. Yonko testified that prior to her incarceration, she provided V.Y. with books, and that if she was to regain custody after being released, she would help V.Y. study and do whatever it took personally to help him get through school. We hold that a reasonable fact-finder could not have formed a firm belief or conviction that Yonko lacked the parental abilities necessary to care properly for V.Y.

*5. Programs Available to Assist the Individual*

Yonko testified that when she was released from prison, she intended to stay in

a halfway house until she could get on her feet. She also testified that Project R.I.O. was willing to give her a job despite her felony conviction. The only evidence offered by DFPS was that counseling would be available to help V.Y. adjust to his foster family. DFPS did not contradict Yonko's testimony that Project R.I.O. would help her find a job, or that she would be able to stay in a halfway house. A reasonable fact-finder could not have formed a firm belief or conviction that that this factor weighs in favor of termination of Yonko's rights, and we therefore conclude that it does not weigh in favor of termination.

6. *Any Excuse for the Parent's Acts or Omissions*

Yonko testified that the reason she did not place V.Y. in school was that she was molested as a student and did not want him to endure a similar experience. This does not excuse her failure to educate V.Y., but her concern for the child's well-being was a factor in her decision not to place him in school. In addition, Yonko's pursuit of her own G.E.D. and other life-skills classes while in prison, and repeated testimony that she learned the value of education while incarcerated, further indicate that Yonko understands that V.Y. must be enrolled in school.

Yonko's decisions resulting in her incarceration were poor ones, despite her professed justification that she did it to further the needs of her family and her son by attempting to care for a sick relative and avoid leaving her son alone while in prison. However, viewing all the evidence, Yonko has also demonstrated an ability to care for V.Y. and has made an effort to improve her parenting abilities for the future. We therefore hold that this factor does not weigh strongly against or in favor of termination of Yonko's parental rights, and that termination of Yonko's parental rights cannot be upheld in this case merely because the excuses for her acts and omissions are inadequate.

7. *Plans for the Child by the Parent and DFPS*

Yonko testified that she intended to get a job, find an apartment, and place V.Y. in school. Yonko was scheduled to be released from prison less than thirty days after the trial in this case. She estimated that she might have to stay in a halfway house at first, and that it would probably take her a couple months to get on her feet. The fact that Yonko had been able to save $4,400 prior to her incarceration indicates that she can be financially responsible. She testified that she might ask for financial assistance from Betty, but that she did not intend to stay with her. Yonko testified that she would spend extra time and do additional home schooling if necessary to help V.Y. with his school work. Yonko had complied with all the terms of the family plan that she could possibly comply with while in prison, by taking the required classes, and DFPS presented no evidence to suggest that she would not comply with the rest of the terms when released from prison.

DFPS presented evidence that V.Y.'s present foster family has considered adopting him, but had not made a final decision at the time of trial. The DFPS caseworker testified that she believed V.Y. was adoptable, because DFPS believes all children are adoptable. It is undisputed that V.Y.'s reading and writing had improved and that he had bonded with his foster family. It is also undisputed that V.Y. was already in his second foster home in six months. DFPS presented no evidence that it had taken any steps to provide a permanent home for V.Y. This factor weighs against termination.

*The Overall Assessment of Best Interest*

Reviewing the factors that weigh in favor of and against termination, we hold the evidence is factually insufficient to support termination of Yonko's parental rights under the clear and convincing evidence standard because (1) the caseworker's opinion supporting termination is substantially undermined by her further assessment of the psychological and emotional damage she concedes would result to the child from termination, with no testimony as to how this damage could be ameliorated other than a reference to counseling; and (2) the State presented scant evidence the trial court could credit as to Yonko's future inability to meet the needs of the child under the *Holley* factors so as to overcome the caseworker's assessment of the emotional risk to the child. *See In re K.C.M.*, 4 S.W.3d 392, 394–95 (Tex.App.-Houston [1st Dist.] 1999, pet. denied) (evidence supporting termination found factually insufficient to establish best interest where mother developed relationship with child prior to incarceration for drugs, wrote numerous letters while incarcerated discussing her plans to reunite with child, did nothing to endanger child after she signed service plan, and had only seventy-five days before release from prison at time of termination trial).[3] The facts in this case parallel the facts in *K.C.M.* Given the presumption that children should remain with their parents, and given the high evidentiary standard that the statute requires the State to meet, a reasonable fact-finder could not have found factually sufficient evidence exists to form a firm belief or conviction that termination in this case is in V.Y.'s best interest.

### Conclusion

We hold that the evidence was legally sufficient to support termination of Yonko's rights based on her failure to enroll V.Y. in school and her failure to provide V.Y. with a stable home environment, and that termination was in V.Y.'s best interest. We hold that the evidence was factually insufficient to support termination, however, because in weighing all of the *Holley* factors, a reasonable fact-finder could not have formed a firm belief or conviction that termination of Yonko's parental rights was in V.Y.'s best interest. Accordingly, we reverse the judgment of the trial court and remand for a new trial.

---

**3.** We note that this court decided *K.C.M.* using a standard of review that the Texas Supreme Court has since disapproved. *See In re C.H.*, 89 S.W.3d 17, 25–26 (Tex.2002). Now, the appropriate appellate standard for reviewing parental termination factual findings is whether the evidence is such that a fact-finder reasonably could have formed a firm belief or conviction about the truth of the State's allegations. *Id.* at 25. This standard retains the deference an appellate court should have for the fact-finder's role. *Id.* at 26. Nevertheless, *K.C.M.* illustrates evidence that lacks factual sufficiency even under the present standard.