

# NUMBER 13-20-00257-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

## IN THE INTEREST OF E.F., J.R.F., J.R.F. AND J.A.B., CHILDREN

**On appeal from the County Court at Law
of Aransas County, Texas.**

# MEMORANDUM OPINION

**Before Justices Benavides, Longoria, and Tijerina
Memorandum Opinion by Justice Longoria**

Appellant "Lisa" appeals the trial court's order terminating her parental rights to her children "Emily," "Jack," "John," and "James."[1] By one issue, Lisa claims that the evidence was legally and factually insufficient to find that termination was in the best interest of the children. *See* TEX. FAM. CODE ANN. § 161.001(b)(2). We affirm.

---

[1] We refer to individuals using aliases to protect the children's identities. *See* TEX. R. APP. P. 9.8(b). We adopt the aliases used by both appellant and the Department of Family and Protective Services.

## I. BACKGROUND

Lisa is the mother of Emily, Jack, John, and James. At the time of trial, their ages were fourteen, ten, nine, and five, respectively. Stephanie Thompson, a former investigator with the Department of Family and Protective Services (the Department), testified that on May 26, 2019, the Department received a report that Lisa's paramour, "Larry," had been holding the family hostage, had sexually abused Emily, and had hit Jack, John, and James with a back scratcher. Thompson contacted Lisa that same day, and Lisa explained to Thompson that Larry was touching Emily inappropriately. For example, Lisa had observed that Larry used to be affectionate towards her with "hugs, kissing, cuddling on the couch, those types of things." However, Larry stopped doing those things with Lisa and started doing those things with Emily. According to Thompson, Lisa suspected that Emily was being abused but "she just let it go because she did not want to get yelled at" by Larry. Lisa also allegedly did not seek help initially because every time she asked Emily about it, Emily denied the abuse. However, Lisa finally contacted her apartment manager about Larry threatening to kill her and her kids at knifepoint. According to Lisa, Larry would tell them that they are not allowed to go anywhere for extended periods of time, especially on the weekends. Lisa claimed that she was scared for her life. Emily made her first outcry statement when the police responded to the hostage situation.

Lisa admitted to Thompson that she was aware that Larry was a registered sex offender. However, Thompson noticed that Lisa gave several different explanations as to when and how she learned of Larry's status as a sex offender. Thompson further noted

2

that Lisa had received several lease violation warnings from the apartment complex for having a registered sex offender on the premises. Lisa and Larry were in a relationship from February 2019 to May 2019, when Larry was arrested.

All of Lisa's children were forensically interviewed at the children's advocacy center. Thompson summarized the sexual abuse that Emily suffered:

> She stated that [Larry] had put his penis into her pepperoni. The CAC staff and interviewer did have pictures to where she could circle the places that [Larry] touched her and circle on the male figure what he had used. So she stated that he had put his penis in her mouth, vagina, and anus. She had a condom count because he was using condoms at one point. So she was able to count those to see how many times he had abused her but then he stopped using condoms. The final count on the condoms was ten. Then he said he was tired of using those things and began to sexually abuse her unprotected and mentioned how he wanted to get her pregnant.

Thompson claimed that she became more and more concerned because

> [Lisa] did not understand what the sexual abuse was even after I explained it. She minimized it. . . . [She] said that in essence she knew it was happening but she did not want it to happen to her. So [it] really seemed like she was putting her daughter in a position, knowing that her daughter was being sexually abused, to avoid any abuse coming at her from him.

Thompson also learned that the family had a prior history with the Department. In November 2018, the Department received a report that Emily had been abused by Emily's father, J.C., which the Department classified as "Reason to Believe." At the time, the Department had given Lisa information and resources to obtain counseling for Emily, but Lisa never followed up.

Based on these concerns, the State filed for removal on June 7, 2019. Thompson wrote in her affidavit in support of removing the children that there is a "great concern for the children's well-being due to [Lisa's] lack of protective capacity . . . . [T]here is also a

concern for [Lisa's] current ability to comprehend the severity of what was occurring."

Sofia Ybarra, a Department conservatorship caseworker, testified that a service plan was created for Lisa on August 12, 2019. The children were placed in a temporary managing conservatorship with "family reunification" listed as the ultimate goal. According to Ybarra, Lisa completed a number of the tasks on the service plan, including maintaining a stable home, attending domestic abuse counseling, submitting to a psychological evaluation, attending individual counseling, and maintaining visitation with the children. However, Ybarra asserted that there were some concerns with the visits. Ybarra testified that on at least one visit, Emily was crying the whole time and did not want to interact with Lisa. Ybarra also observed that Lisa and Emily did not appear very close; Lisa seemed to interact much more with Jack, John, and James.

Ybarra further testified that Lisa's relationship history was concerning. Emily's father was physically abusive and would drink until intoxication frequently. Lisa was not allowed to go anywhere without him. J.R., the father of Jack, John, and James, was physically and verbally abusive. Lisa asserted that she left J.R. because she did not want the boys to be around that kind of behavior. Ybarra testified that Lisa's history of abusive relationships prior to Larry raised additional concerns regarding Lisa's ability to protect the children and her ability to understand the danger.

Additionally, Ybarra was concerned because in November 2019, Lisa disclosed to the Department that she had been in a new relationship with a man named "Clarence." Lisa admitted that she had been in a relationship with Clarence starting in August 2019, but they stopped seeing each other in November. Ybarra testified that she was concerned

4

because Lisa refused to immediately disclose the relationship. Because Lisa had "made a bad choice" in dating Larry, Ybarra asked Lisa what was different this time with Clarence. Lisa told Ybarra that "she had a good feeling about him." Ybarra further asked if Lisa had any good feelings about Larry while they were in a relationship. Even though Lisa admitted that she did not have good feelings about Larry, Lisa exclaimed that she remained with Larry because she was "living her dream" of being intimate with a man of Larry's ethnicity. It was further concerning to Ybarra that Lisa entered a new romantic relationship with Clarence, so shortly after the incident with Larry, without taking any protective measures, such as doing a sex offender registry search. All of these concerns led the Department to change its permanency goal from reunification to adoption.

On June 16, 2020, a bench trial was held. Laura Morales, a licensed professional counselor, testified that she saw Lisa for individual therapy as well as Lisa and Emily together for family counseling. Morales testified that she first started seeing Lisa in January 2020 and had thirteen sessions in total with her. Morales was worried because Lisa lacked any awareness concerning the sexual abuse suffered by Emily. Morales was concerned that Lisa was not "getting it," despite her psychological evaluation showing that Lisa suffered from no mental impairments. Morales claimed that Lisa lacked the ability to see what road her relationships were heading down, struggled to recognize unhealthy relationships, and failed to be protective of the children, especially Emily. Furthermore, Morales testified that she never got "an answer as to why when things started to go wrong that she did not get out or she did not, you know, act in a protective way other than fear."

5

Morales also testified concerning Lisa's plan for future relationships. Lisa told Morales that she would ask the Department to run a background check on anyone she met in the future. Lisa also claimed that she would not let anyone in the home if they did not have a job. Lisa further planned on having a certified babysitter and checking future romantic partners on the sex offender registry application she had installed on her phone. Lastly, Lisa informed Morales that she planned on abstaining from romantic relationships for the next thirteen years. However, Morales did not think this plan was feasible given Lisa's history of constantly being in a relationship. Morales opined that Lisa currently has all the tools she needs to be protective of her children in the future, but the question remained as to whether Lisa would actually utilize those tools. Morales claimed that Lisa "essentially did not know she wasn't being protective" and said, "How can you fix something when you don't know what you don't know?"

Regarding her counseling sessions with Emily, Morales testified that Emily denied feeling any resentment towards Lisa. Morales found Emily's lack of negative feelings towards Lisa odd. Lisa and Emily were not very talkative during family therapy sessions. However, despite their strained relationship, Morales did not think it would be good for Emily if she never spoke with Lisa again.

Lisa further admitted that she allowed the initial protective order issued against Larry to lapse for about six months until she renewed it. According to Lisa, she did not initially renew the protective order because "[i]t was just too traumatic" and she did not want Emily to be involved or have to testify again.

6

Ybarra testified that all four of the children are with the same foster family that they have been with for the majority of the pendency of this case. The foster parents have procured specialized counseling for Emily regarding sexual abuse. Emily still has nightmares about Larry, but Ybarra testified that the children are doing very well. Ybarra was concerned for Jack, James, and John because all three of them were behind as to their reading levels, but all three of them have made improvements since being placed in foster care.

Brisa Zurita, Emily's current mental health therapist at the Children's Advocacy Center, testified that Emily has only just recently opened up about Lisa. Emily has indicated that she misses Lisa. Zurita explained a situation in which Emily "saw [Larry's] face" and became really scared, causing Emily to hit her foster mother. Zurita opined that Emily needed a caregiver that was supportive of her therapeutic goals.

Ybarra testified that the Department plans to continue the children's current placement while they look for appropriate caregivers amongst the family's relatives. Even though all four of the children have expressed some desire to return to Lisa, Ybarra testified that there was a risk that Emily would be sexually abused yet again. According to Ybarra, Emily had been sexually abused by both her father and her uncle before experiencing sexual abuse from Larry. Ybarra opined that Lisa still does not understand what sexual abuse is, the trauma that Emily has experienced, or how the children have been negatively impacted by her relationships.

Carmen Ramirez, the guardian ad litem for the children, testified as follows near the conclusion of the termination hearing:

> This is a very difficult case. I understand that mom has worked her services. What I find difficult to understand is how it takes four incidences of sexual abuse before someone finally realizes that something needs to be done to try to prevent it from happening again in the future. And so the first incident was mother when she herself was sexually abused as a child and no one took her seriously or listened to her and it actually caused her post-traumatic stress. Then we have [Emily] who [] has been through this three times with three different men; with her father, with her, I believe, it was her uncle was the second time if that's correct and then with [Larry] was the third time, and [the] only time out of all of this history where [Lisa] went to get the police was when there was a physical abuse against her where he was choking her. It was [Emily] who had to tell the police that this man was sexually abusing her. So [Emily] had to protect herself against sexual abuse.

Ramirez also detailed the academic needs of the children. Ramirez spoke with the children's foster mother and learned that when the four children arrived at the foster home, none of them could read. The foster mother had to provide intensive, individual attention to help them all learn how to read. Additionally, according to Ramirez, the foster mother is concerned that Emily might be engaging in "some inappropriate phone contact with strangers who are wanting . . . her to send pictures of herself."

Even though Lisa outlined her plans to protect the children going forward, Ramirez explained her concerns for the children's future:

> So we have serious issues going forward and the concern is that [Lisa] doesn't understand or does not have the resources or the skills to follow through in getting these kids the academic help they need, the counseling help that they are going to need. All of this is long term and I don't need [sic] to be rude but if somebody is working at McDonald's, how are they going to pay for a specially trained babysitter. I think that there is just too much at stake going forward and [Emily] is in an extremely vulnerable position right now which is why she may be engaging in these inappropriate phone conversations. So I think that it is a huge risk. I am not sure that 13 counseling sessions is enough for [Lisa] to truly understand even when she is still communicating with one of the abusers who is [Emily's] dad. She is telling him how [Emily] is doing, staying in touch with him as if nothing ever happened. These are some serious long-term consequences.

8

After hearing the evidence and the recommendations, the trial court made the following observations:

> What I find, though, is that the long history of turning the other way and ignoring the situation, these weren't red flags that were presented to [Lisa]. These were red billboards. And to the extent of not recognizing the situation, I find impossible to believe. And it is to the point of seeming intentional. I understand fear, but at the same time, she was out of that house many times going to work where she could have taken action and she did not.

Accordingly, the court found by clear and convincing evidence that Lisa had (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional wellbeing of the children; and (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E). The trial court also found by clear and convincing evidence that it was in the best interest of all four children if Lisa's parental rights were terminated. *See id.* § 161.001(b)(2). The trial court also terminated the parental rights as to each father of the children.[2]

## II. BEST INTEREST

Lisa does not challenge the predicate grounds for termination under Texas Family Code § 161.001(b)(1)(D) and (E). Instead, by a single issue, Lisa argues that the evidence was legally and factually insufficient to support the trial court's determination that it was in the best interest of the children to terminate her parental rights.

### A. Standard of Review & Applicable Law

"Parental rights may be terminated only upon proof of clear and convincing

---

[2] Neither of the fathers are a party to this appeal.

evidence that the parent has committed an act prohibited by § 161.001(1) of the Texas Family Code, and that termination is in the best interest of the child." *In re E.A.G.*, 373 S.W.3d 129, 140 (Tex. App.—San Antonio 2012, pet. denied). Clear and convincing evidence is "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007.

When the legal sufficiency of the evidence is challenged in a parental termination case, we look at all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *See In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). Accordingly, we assume the finder of fact resolved all disputed facts in favor of its finding, if a reasonable factfinder could do so; likewise, we disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* When the factual sufficiency is challenged in a parental termination case, we also consider the conflicting evidence. *Id.* If the disputed evidence is so "significant" that it would prevent a reasonable factfinder from forming a firm belief of the findings, then the evidence is factually insufficient. *Id.*

In reviewing a best interest finding, we consider the non-exclusive *Holley* factors. *See In re E.N.C.*, 384 S.W.3d at 807 (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)). These factors include: (1) the children's desires; (2) the children's emotional and physical needs now and in the future; (3) any emotional and physical danger to the children now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist the individuals seeking custody to promote the best

10

interest of the children; (6) the plans for the children by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions which may indicate that the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *Id.*

## B. Analysis

### 1. The Desires of the Children

At the time of trial, Emily, Jack, James, and John were fourteen, ten, nine, and five, respectively. The record shows that all four of the children expressed a desire to return to Lisa. However,

> [a]lthough a child's love of his natural parents is a very important consideration in determining the best interests of the child, it cannot override or outweigh the overwhelming and undisputed evidence showing that the parents placed or allowed the child to remain in conditions, and engaged in conduct or placed the child with persons who engaged in conduct, which endangers the physical and emotional well-being of the child. The child's love of his parents cannot compensate for the lack of an opportunity to grow up in a normal and safe way equipped to live a normal, productive, and satisfying life.

*In re W.S.M.*, 107 S.W.3d 772, 773 (Tex. App.—Texarkana 2003, no pet.); *see Yonko v. Dep't of Family & Protective Services*, 196 S.W.3d 236, 245 (Tex. App.—Houston [1st Dist.] 2006, no pet.) ("Where the evidence of the parent's failures is not overwhelming, the desires of the child weigh against termination of parental rights."). Thus, in the present case, the first factor technically weighs in favor of reunification; however, the children's desire to return to Lisa is outweighed by the overwhelming nature of her repeated failures. *See Yonko*, 196 S.W.3d at 245; *In re W.S.M.*, 107 S.W.3d at 773.

11

## 2. The Present and Future Emotional and Physical Needs of the Children; the Emotional and Physical Danger to the Children Now and in the Future.

Lisa does not challenge the trial court's findings that she placed or engaged in conduct that placed her children in conditions that endangered their physical or emotional well-being. "While it is true that proof of acts or omissions under [§] 161.001(1) does not relieve the petitioner from proving the best interest of the child, the same evidence may be probative of both issues." *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002); *see In re D.L.N.*, 958 S.W.2d 934, 934 (Tex. App.—Waco 1997, pet. denied) (holding that a factfinder may infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent); *see also In Interest of A.F.C.*, No. 04-17-00080-CV, 2017 WL 3159447, at *5 (Tex. App.—San Antonio July 26, 2017, no pet.) (finding that the trial court could have determined, based on the mother's past conduct and history of exposing the children to dangerous situations, that the mother "lacked the abilities needed to properly parent her young children").

Based on the record and Lisa's own admissions, Lisa observed Emily and Larry "holding hands, that he was hugging her, groping on her and then . . . [Emily] and [Larry] would lay on the couch together before falling asleep." And yet despite these observations and despite knowing that Larry was a sex offender, Lisa would leave Larry alone with the children while she went to work. Lisa also admitted that J.C. sexually abused Emily, and yet Lisa never reported it to law enforcement or sought counseling for Emily.

Thompson, Ybarra, Morales, and Ramirez all testified regarding various concerns about Lisa's ability to protect her children and meet their needs. Thompson was concerned because Lisa minimized the severity of the sexual abuse. Lisa knew her

12

daughter was being sexually abused by her paramour, and it "really seemed like [Lisa] was putting her daughter in a position, knowing that her daughter was being sexually abused, to avoid any abuse coming at [Lisa] from [Larry]." Furthermore, Ybarra was concerned because of Lisa's history of choosing to be in abusive relationships and how quickly Lisa was willing to enter a new relationship so shortly after Larry based simply on a "good feeling," without checking sex offender registries. Ybarra also found it concerning that Lisa failed to inform the Department that she had been in a new relationship until after the new relationship had already ended.

Morales was additionally concerned that Lisa was not "getting it." Morales admitted that Lisa had actually attended the therapy and counseling sessions as ordered as part of her plan, but despite all of the counseling, Lisa was still not understanding the signs of sexual abuse or recognizing what an unhealthy relationship looks like. Morales also expressed concerns for Lisa's future plans to protect the children because Morales did not think Lisa's plan of simply abstaining from relationships for thirteen years was feasible given her history of constantly being in unhealthy relationships. Ultimately, Morales was concerned that Lisa could not be protective of the children in the future because Lisa did not even recognize that she was not being protective of the children in the past. Ramirez testified that Lisa "doesn't understand or does not have the resources or the skills to follow through in getting these kids the academic help they need, the counseling help that they are going to need." Ramirez and the children's foster mother were very concerned that none of the children knew how to read upon arrival at the foster home. The children only learned how to read upon the intensive intervention and individual attention on the part of

13

the foster mother.

In sum, the record established that the children's physical and emotional well-being were endangered on numerous occasions. Lisa engaged in consecutive romantic relationships that endangered the children and exposed them to verbal, physical, and sexual abuse. Emily suffered the greatest exposure to abuse, but the boys were also placed at great risk, exposed to the abuse of their mother and Emily, and physically abused themselves. Furthermore, the record provided ample testimony that Lisa was not learning or growing in a way that would allow her to accommodate the children's present or future needs. There was great concern that Lisa, even after extensive counseling, was not understanding the signs of sexual abuse, her need to protect the children, or the negative impact her abusive relationships were having on the children. The second and third *Holley* factors weigh heavily in favor of termination.

### 3. Parental Abilities of the Individuals Seeking Custody

This factor overlaps with our discussion of the second and third factors. Thompson, Ybarra, Morales, and Ramirez all testified concerning Lisa's lack of parental abilities. According to their testimony, Lisa repeatedly failed to protect Emily. Emily had been sexually abused by three different men while in Lisa's care. Lisa remained in contact with one of the past sexual offenders, J.C., and updated him on Emily's life, as if "nothing ever happened." Despite obvious signs of sexual abuse, such as Emily and Larry sleeping on the couch together and Larry's known status as a sex offender, Lisa left the children with him while she went to work. And despite having been in three consecutive abusive relationships, Lisa entered into a fourth relationship relatively quickly after Larry was

14

arrested based simply on a "good feeling." As Morales commented, there is still a considerable risk that Lisa would fail to protect the children in the future because Lisa "essentially did not know she wasn't being protective." The fourth *Holley* factor weighs in favor of termination.

### 4. Programs Available to Assist the Individuals Seeking Custody to Promote the Best Interest of the Children

The record established that counseling was made available to Lisa and that she attended the counseling as required under her family service plan. However, abundant testimony was presented expressing concern that Lisa was not learning from the counseling sessions. The fifth *Holley* factor marginally favors termination.

### 5. Plans for the Children by the Individuals or the Agency Seeking Custody

Lisa explained some of her plans to protect the children and provide for their needs in the future. However, Morales was concerned that her plans were not feasible because she did not think it was likely that Lisa could entirely abstain from romantic relationships for the next thirteen years. And Ramirez was concerned that Lisa would not be able to accommodate the children's academic or counseling needs.

Even though the Department is investigating several relatives and searching for a compatible match, the Department admitted that there is currently no family lined up to adopt the children. Instead, the Department plans to keep the children with their current foster family. Ramirez testified that the children have done extremely well since their placement with the foster family. Emily has received sexual abuse counseling and all four of the children have learned how to read. The sixth *Holley* factor weighs slightly in favor of termination.

15

### 6. Stability of the Home or Proposed Placement

On one hand, the record established that Lisa maintained the same home throughout the case. According to testimony, there was ample space in the home and the living arrangements were appropriate for her and the children. Furthermore, there was no evidence that the children had poor hygiene or were malnourished at any point. On the other hand, Emily, Jack, James, and John were all repeatedly exposed to verbal, physical, and sexual abuse in the home from Lisa's romantic partners. Jack described scenes of family violence, including choking, screaming, Emily being poked with a knife, Lisa being bitten on the nose and stomach, and Lisa bleeding from the ear. Thompson testified that at least one of the boys explained being scared and trying to sleep but hearing all of the noise. So, while Lisa may have provided adequate food and housing, she failed to provide a safe home for the children. This factor weighs in favor of termination.

### 7. The Acts or Omissions of the Parent that May Indicate that the Existing Parent-Child Relationship is not a Proper one and any Excuse for the Acts or Omissions of the Parent.

Morales expressed concern for Lisa's lack of protective qualities. Despite counseling and therapy, Lisa was still not recognizing that she was not adequately protecting the children. Lisa was not being protective of her children in the way a normal parent should be.

Lisa does not offer any explicit excuses for her overall behavior. Lisa was seemingly aware that Emily was being abused by Larry but permitted the abuse to continue out of fear of retribution. Lisa admitted to Ybarra that despite not having a "good feeling" about Larry, Lisa remained with him to live out her dream of being intimate with

a man of Larry's ethnicity. She offers no excuse as to why the children were so far behind academically or why she refused to seek out counseling for Emily for the sexual abuse she experienced prior to Larry's abuse. The eighth and ninth factors weigh in favor of termination.

## C. Summary

Looking at the evidence of the *Holley* factors in the light most favorable to the trial court's verdict, we conclude that the evidence is legally sufficient because a reasonable trier of fact could form a firm belief or conviction that termination was in the best interest of the children. *See In re J.O.A.*, 283 S.W.3d at 344. In reviewing the trial court's decision for factual sufficiency, we have considered evidence of the children's desire to remain with Lisa, the children's proper nourishment and hygiene, and Lisa's attempts to improve her parenting abilities by attending counseling as outlined in her family plan. However, we conclude that the evidence is factually sufficient because the disputed evidence regarding the *Holley* factors is not so significant that it would prevent a reasonable factfinder from forming a firm belief or conviction that termination was in the children's best interests. *See id.* The record reflected that Lisa repeatedly failed to protect her children, especially Emily, from several different types of abuse. Furthermore, several caseworkers, the attorney ad litem, and the therapist expressed concerns that there was a considerable risk that the children would continue to be exposed to further abuse because of Lisa's complete lack of protective capacity.

We overrule Lisa's sole issue.

17

## III. Conclusion

We affirm the trial court's judgment.

NORA L. LONGORIA
Justice

Delivered and filed the
17th day of December, 2020.