In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-18-00437-CV**
_____

**IN THE INTEREST OF B.C.H.**

**On Appeal from the 317th District Court**
**Jefferson County, Texas**
**Trial Cause No. C-225,800**

**MEMORANDUM OPINION**

This is an appeal from the termination of P.P.'s (Mother) parental rights to

B.C.H.[1] In an involuntary private termination proceeding brought by the paternal

grandparents, the trial court terminated Mother's parental rights, finding clear and

convincing evidence of prohibited predicate acts under Texas Family Code sections

161.001(b)(1)(A), (B), (C), (D), (E) and (F), and that termination was in the best

---

[1] To protect the privacy of the parties, we use the child's initials and refer to
the other individuals by their relationship to the child. *See* Tex. Fam. Code Ann. §
109.002(d) (West Supp. 2018); Tex. R. App. P. 9.8.

interest of the child.[2] *See* Tex. Fam. Code Ann. § 161.001(b)(1)(A)–(F) (West Supp. 2018).[3] The case was tried to the bench. In three issues on appeal, Mother contends: (1) the evidence is legally and factually insufficient to support the trial court's determination by clear and convincing evidence that grounds for involuntary termination exist under section 161.001(b)(1)(A)–(F); (2) the evidence is legally and factually insufficient to support the trial court's determination by clear and convincing evidence that termination was in the child's best interest; and (3) the trial court's termination order lacks material findings, is improper, unenforceable, void and unconstitutional. *See id.* We reverse the portion of the trial court's order terminating Mother's parental rights and render judgment for Mother.

## I. Background

At the time of trial, B.C.H. was ten and a half years old. Except for approximately six months when he was two years old, B.C.H. has always lived with his paternal grandparents, where B.C.H.'s Father also resides.[4] Prior to the

---

[2] Father signed an affidavit of voluntary relinquishment, and the trial court terminated his rights on that basis. He is not a party to this appeal.

[3] We cite the current version of the statute as the predicate factors the trial court based the termination on remain unchanged in substance by the amendments effective September 1, 2017.

[4] Grandmother testified that while Father lives in the home, he does not have a true father-type relationship with B.C.H. "[Father] is more like a brother or an uncle kind of figure to him. [Father] doesn't take on any disciplinary-type role."

2

grandparents being appointed sole managing conservators of B.C.H., Mother indicated B.C.H. lived with her part of the time and went "back and forth" to the grandparents. While we have little facts in the record regarding the early years of the life of B.C.H., Mother testified during the first two years of his life, she lived with him at the grandparents' home and provided him with "his formula, his food, his clothing, everything."

By way of an order in a suit to modify parent-child relationship ("SAPCR") dated September 15, 2014, the trial court appointed the paternal grandparents as the sole managing conservators of B.C.H. and appointed Mother and Father as possessory conservators with rights of visitation.[5] The original order provided Mother with regular visitation, but it prohibited Mother from removing B.C.H. from Jefferson County or a contiguous county without obtaining written permission from the grandparents. The order also provided that B.C.H. could not have any contact with Mother's boyfriend, J.Z., and that "[i]f the child is in the presence of [J.Z.] at any time, access to and possession of the child by [Mother] shall be suspended until further order of the Court."

---

[5] No record from the SAPCR suit was included in the record for this appeal. We have no way to tell if Mother consented to arrangement. Mother did not sign the SAPCR order and the order states Mother was not represented by counsel but made an appearance.

At the termination hearing, Grandmother confirmed that she felt it was in B.C.H.'s best interest that the court terminate Mother's parental rights. She testified that Mother had voluntarily left B.C.H. in her possession without expressing an intent to return, failed to provide adequate support during that time, and had remained away for a period of at least three months. Further, Grandmother testified that when B.C.H was a baby, this happened at least two or three times a year, and it was not uncommon to go months without seeing Mother. Grandmother indicated there were also periods where Mother remained away for at least six months. Grandmother stated that at the time of the termination hearing, Mother had left B.C.H. with her, had not provided support, and had remained away for a period of over six months. Grandmother testified that she had not spoken to Mother in six months, and Mother had not tried to call. Grandmother further agreed that Mother knowingly placed or allowed B.C.H. to remain in conditions or surroundings that endangered his physical or emotional well-being while the child was in Mother's possession.

After the grandparents were appointed as sole managing conservators, Mother moved to Kenedy, Texas, near San Antonio. Grandmother described Mother's visits over the years as "sporadic, always late, never what was scheduled" and lacking structure. Grandmother testified that initially, B.C.H. did not want to visit his

4

Mother, and they had to coax him, but he eventually looked forward to the visits. Grandmother indicated B.C.H. was disappointed when Mother showed up late or cancelled the visits. Grandmother testified that after Mother's visits with B.C.H., he would return combative and angry, and she felt Mother was telling B.C.H. inappropriate things about his grandparents. Grandmother further testified she once overheard a conversation wherein J.Z. threatened to kill B.C.H.'s father.

Grandmother testified that at one point before the court appointed them managing conservators, B.C.H. had broken his teeth when he fell at a water park and required extensive dental work. According to Grandmother, it took more than two years to get his teeth fixed because Mother would not send the grandparents the appropriate insurance documentation after they requested it from her. Mother contradicted this testimony and explained that B.C.H. had always had bad teeth because of an enamel deficiency. Mother asserted she sent the necessary dental card and Medicaid card for the dental work. Grandmother said they immediately fixed B.C.H.'s teeth when they were granted custody in 2014, because they put him on their insurance and obtained Medicaid benefits for him.

Grandmother explained that Mother never had what she needed when she exercised visitation with B.C.H. and specifically mentioned car safety seats. Grandmother indicated they had to provide everything for him when B.C.H. visited

5

Mother, including clothes. Mother disagreed with this. It was undisputed that Mother failed to pay the grandparents any money for the court-ordered child support for B.C.H. until August 2017.

Grandmother opined that the grandparents' home was fun, B.C.H. had friends over to play, and they planned to enroll him in piano lessons. Grandmother further testified that B.C.H. is in a stable environment and is thriving. Grandmother testified that their son, B.C.H.'s father, lives in the home with them, but they do not have "a true father-type relationship."

Exhibits revealed Mother received deferred adjudication for a criminal charge of credit card abuse of the elderly in 2014. While on probation for that offense, Mother tested positive for alcohol and cocaine on one occasion in 2016 and violated other terms of her probation. Her probation was not revoked despite a request for adjudication by the State, but it was extended an additional two years and is scheduled to end in 2022. It was mentioned that Mother and Father were previously involved with illegal drugs, but no details were provided beyond Mother's probation violation. It was Grandmother's opinion that it would not be in B.C.H.'s best interest to be with a person who steals credit cards and uses illegal drugs.

Grandmother described an incident that occurred in 2015 which eventually led to the grandparents suspending Mother's visits entirely. During a visit, Mother

6

took B.C.H. outside the restricted geographical boundaries to her home near San Antonio without the grandparents' knowledge or permission. During that visit, B.C.H. spent time with Mother's boyfriend, J.Z., in violation of the trial court's order. When the grandparents learned of the prohibited trip, they did not immediately terminate Mother's visits but told Mother she could only visit B.C.H. in their home once a month. Mother did not have a driver's license or a vehicle. The grandparents also restricted Mother's phone calls to B.C.H. to Mondays and Wednesdays between 7 and 8 p.m. because Mother sometimes called very late at night. Grandmother testified that when they advised Mother of these restrictions, Mother responded that they "were sick individuals," and they did not hear from her for fifteen weeks.

When asked by the court why they did not immediately stop Mother's visits for her violations of the court order, Grandmother explained, "[b]ecause at the time, [B.C.H.] did enjoy spending the time with his mom and she had come frequent enough." Grandmother also indicated she felt at the time it was in B.C.H.'s best interest to keep the connection with Mother. In attempting to explain why she felt it was ultimately in B.C.H.'s best interest to stop Mother's visits, Grandmother said "he was leveling out and becoming more – he wasn't as agitated like he was when he would come home from being with her[.]" She also said they were concerned by

7

some of the stories B.C.H. told when he came home, but she did not provide any details regarding the content.

According to Grandmother, Mother did not call during the allotted times. Instead, Mother would call at 11 p.m. or 2 a.m. The grandparents eventually blocked Mother's calls but testified that Mother was still able to leave voicemails. Grandmother told the court Mother would leave voicemails stating she called to talk to B.C.H. and to tell him she loved him, then she would hang up. The grandparents received voicemails from Mother through November 2017, but Grandmother indicated she did not share Mother's voicemails with B.C.H. after 2015. Mother testified that the grandparents would never answer her calls and eventually, she was unable to even leave voice mails on Grandmother's phone, but that she never received any return calls and she became disheartened.

After having her access to B.C.H. restricted by the grandparents, according to Grandmother, Mother never tried to arrange a visitation with B.C.H. through her attorney or the court. Grandmother testified that on one occasion in May 2016, after the termination suit had been initiated, Mother came to the grandparents' home unannounced with a law enforcement officer demanding to see B.C.H. The Grandmother testified that they explained to the officer the circumstances, and Mother was asked to leave without seeing B.C.H. Grandmother indicated B.C.H. has

8

not asked to talk to his Mother or seen her in two years and felt B.C.H. was doing better since Mother was not around.

While acknowledging that Mother's child support balance was zero at the time of trial, Grandmother testified that although the court ordered Mother to pay child support in the amount of $100 per month beginning in September 2014, the first payment Mother made was on August 8, 2017. This was after the grandparents filed the petition for termination and adoption. Mother made a total of six payments after the grandparents filed their petition for termination and adoption to bring her child support obligation current.

Mother testified that she loves B.C.H. and denied she voluntarily left him in the possession of his grandparents and expressed an intent not to return. Mother confirmed her last visit was in 2015. Mother testified that she has attempted to see B.C.H. and made phone calls, and it was hurtful for her after leaving voicemails and not receiving a response.

Mother confirmed she was aware of the contents of the court order from the SAPCR proceeding which provided that she could not remove B.C.H. from the restricted area or allow B.C.H. to be around J.Z. Mother admitted she lied to the grandparents and told them she was taking B.C.H. to see one of her family members in a contiguous county, but in reality, she took B.C.H. to her home near San Antonio.

9

Mother explained that she wanted to take B.C.H. to visit her mother. Mother also admitted that while there, B.C.H. was in the presence of J.Z., even though she knew the trial judge had prohibited her from having B.C.H. around him. When asked why J.Z. should not be around B.C.H., Mother indicated that the boyfriend "liked to smoke a lot of weed and stuff like that," but she denied he ever threatened to kill B.C.H.'s father. Mother testified that she "was being dumb[,]" and right after the trip, when she realized the grandparents were not going to allow her to visit with B.C.H., she "completely cut off contact with [J.Z.]"

Mother testified that she failed one drug test about six months after she was placed on deferred adjudication, but since then, she has not failed a drug test despite being tested over twenty times. She also completed her community service and paid her fines. Mother testified she admitted to her probation officer that she used cocaine and, instead of adjudicating, the court extended her probation another two years.

Mother stated she did not have an excuse for failing to pay child support. However, she did not testify that she was working nor was she asked on cross-examination if she had the ability to pay support prior to the initiation of the suit to terminate her rights. She testified that the grandparents deserved the money and that is why she tried to pay it off. Mother described the challenges of living so far away from B.C.H. and how that impacted her ability to visit. Mother testified she is not

currently employed because she is trying to complete her accounting degree online. She also testified that she got married a week before the trial, and she and her husband continue to reside in Kenedy, Texas. Mother indicated she was able to pay her child support arrearage because she recently began receiving payments from oil wells on her family's property; however, she did not want to answer the question regarding how much money she received. Mother testified that the amount she receives depends on the price of oil but that she receives "[e]nough."

## II. Standard of Review

The standard of proof required in cases involving termination of parental rights is clear and convincing evidence. *See* Tex. Fam. Code. Ann. § 161.001(b) (West Supp. 2018); *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012) (citing *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002)). Clear and convincing evidence is defined as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014); *In re J.F.C.*, 96 S.W.3d at 264; *see also In re E.N.C.*, 384 S.W.3d at 802.

When conducting a legal sufficiency review of the termination of parental rights,

> a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have

11

formed a firm belief or conviction that its finding was true. To give appropriate deference to the factfinders' conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. This does not mean that a court must disregard *all* evidence that does not support the finding. Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.

If, after conducting its legal sufficiency review of the record evidence, a court determines that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient. Rendition of judgment in favor of the parent would generally be required if there is legally insufficient evidence.

*In re J.F.C.*, 96 S.W.3d at 266; *see also In re E.N.C.*, 384 S.W.3d at 802; *In re J.O.A.*, 283 S.W.3d 336, 344–45 (Tex. 2009).

When conducting a factual sufficiency review of the termination of parental rights, we "must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *In re J.F.C.*, 96 S.W.3d at 266 (citing *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). We

should consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient.

12

*In re J.F.C.*, 96 S.W.3d at 266. We must give due deference to the fact finder's findings, and we cannot substitute our own judgment for that of the fact finder. *See In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam) (citations omitted).

### III. Analysis

To terminate parental rights, a trial court must first find: (1) a parent committed one or more prohibited predicate acts under Texas Family Code section 161.001(b)(1); and (2) termination of the parent's rights is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005); *see also In re S.M.R.*, 434 S.W.3d 576, 580 (Tex. 2014). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). As noted above, the evidence to support these findings must be clear and convincing. *See* Tex. Fam. Code Ann. §161.001(b). The evidence is clear and convincing when the proof is such that it produces in the mind of the trier of fact a firm belief or conviction of the truth of the allegations sought to be established. *See* Tex. Fam. Code Ann. § 101.007; *In re C.H.*, 89 S.W.3d at 25–26. Here, the trial court found that Mother engaged in the prohibited predicate acts outlined in each of Texas Family Code subsections 161.001(b)(1)(A), (B), (C), (D), (E), and (F). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(A)–(F).

13

**A. Issue One: Legal and Factual Sufficiency to Support Grounds for Termination**

The Texas Supreme Court has stated "[t]ermination of parental rights is traumatic, permanent, and irrevocable[,]" and they "cannot think of a more serious risk of erroneous deprivation of parental rights than when the evidence, though minimally existing, fails to clearly and convincingly establish in favor of [] findings that parental rights should be terminated." *See In re M.S.*, 115 S.W.3d 535, 549 (Tex. 2003). Mother argues that the evidence is legally and factually insufficient to support each of the predicate findings. "Only one predicate finding under [the termination statute] is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *In re C.A.J.*, 459 S.W.3d 175, 179 (Tex. App.—Texarkana 2015, no pet.) (citations omitted). Therefore, we find it necessary to examine each ground on which the trial court based the termination.

**1. Predicate Findings under 161.001(b)(1)(A)–(C) – Abandonment**

The trial court based its decision to terminate Mother's parental rights, in part, under Texas Family Code subsections 161.001(b)(1)(A), (B), and (C). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(A)–(C). Section 161.001(b)(1)(A)–(C) states that

> [t]he court may order termination of the parent-child relationship if the court finds by clear and convincing evidence:

14

(1) that the parent has:

    (A) voluntarily left the child alone or in the possession of another not the parent and expressed an intent not to return;

    (B) voluntarily left the child alone or in the possession of another not the parent without expressing an intent to return, without providing for the adequate support of the child, and remained away for a period of at least three months;

    (C) voluntarily left the child alone or in the possession of another without providing adequate support of the child and remained away for a period of at least six months[.]

*Id.*

We address these predicate findings together as all of them contain a "voluntarily" component. *See id.* Subsections (A) and (B) additionally contain a "not the parent" element. *See id.* § 161.001(b)(1)(A), (B). Finally, subsection (B) requires a three-month period where the parent remained away, and subsection (C) requires a six-month period where the parent remained away. *See id.* § 161.001(b)(1)(B), (C).

Mother contends that she did not voluntarily leave the child since she left B.C.H. pursuant to a court order, she did not express an intent not to return, and Mother further argues that the child was left in the same home as his father. Further, Mother contends the grandparents failed to establish by clear and convincing evidence the requisite time for remaining away from B.C.H.

15

In support of her contention that she did not "voluntarily" leave B.C.H. because she did so only pursuant to a court order, Mother relies on *In re J.K.H.*, No. 06-09-00035-CV, 2009 WL 2948575, at *3 (Tex. App.—Texarkana Sept. 16, 2009, no pet.) (mem. op.). In that case, the Texarkana Court of Appeals determined a father who left his children in the care of their mother pursuant to a default divorce decree that appointed her as sole managing conservator had not "voluntarily" left his children. *See id.* There was evidence in that case that the father did not participate in the supervised visits allowed under the decree; however, the court reasoned voluntarily missing visits "is not the question" under subsection (C). *See id.* Instead the "question is whether he voluntarily left them in the possession of mother." *Id.* Since the divorce decree required the father to leave the children with their mother, the court concluded he did not do so voluntarily, and there was legally insufficient evidence of this requirement in subsection (C) to terminate the father's rights. *See id.* Likewise, here, the order from the SAPCR proceeding named the grandparents as the sole managing conservators, thus requiring Mother to leave the child with the grandparents. Accordingly, she cannot be said to have left B.C.H. voluntarily for purposes of subsections (A) through (C). *See In re J.G.S.*, ---S.W.3d---, No. 01-18-00844-CV, 2019 WL 1199521, *7–8 (Tex. App.—Houston [1st Dist.] Mar. 14, 2019, no pet. h.); *In re J.K.H.*, 2009 WL 2948575, at *3.

16

We also find this case distinguishable from *In re H.S.*, where our sister court in Dallas upheld a termination on this ground, despite the father's argument he did not leave the children voluntarily with their grandmother, because he did so pursuant to a court order. *See In re H.S.*, No. 05-16-00950-CV, 2016 WL 7163864, at *5 (Tex. App.—Dallas Dec. 6, 2016, no pet.) (mem. op.). There, the court noted that the father participated in the conservatorship proceeding, but he made no request that he be named managing conservator or oppose the grandmother's request to be named managing conservator. *See id.* The record before us does not indicate the circumstances under which the original SAPCR order was entered and whether Mother agreed to the arrangement. The SAPCR order was the only document from that proceeding entered into the record during the termination proceeding, which only indicated Mother participated in the SAPCR.

Subsections (B) and (C) permit termination of parental rights on clear and convincing evidence that the parent remained away for a requisite period of time. The six-month period referred to in the statute must be six consecutive months. *Jordan v. Dossey*, 325 S.W.3d 700, 727 (Tex. App.—Houston [1st Dist.] 2010, pet. denied); *In re T.B.D.*, 223 S.W.3d 515, 518 (Tex. App.—Amarillo 2006, no pet.) (citations omitted). It is necessary that the consecutive six-month period in subsection (C) "correspond to the event of voluntarily leaving the child with

17

another." *See In re J.G.S.*, 2019 WL 1199521, *7 (citing *In re F.E.N.*, 542 S.W.3d 752, 763 (Tex. App.—Houston [14th Dist.] 2018, pet. filed)).[6] Thus, it was necessary for the grandparents to present evidence that Mother remained away, or did not visit B.C.H. or attempt to visit B.C.H., during a period of three consecutive months to support a finding under subsection (B) or a period of six consecutive months under subsection (C). *See id.* at *8 (citing *Jordan*, 325 S.W.3d at 727).

While there was testimony from Grandmother that she had not seen Mother for the requisite period(s), Grandmother's testimony was conclusory and failed to establish the necessary timeline for Mother remaining away. Grandmother asserted that Mother had not seen the child since July 2015, when Mother took him to Kenedy, Texas. However, there were no specific dates provided in the record to substantiate her claim. There was testimony that Mother attempted to visit the child and brought a police officer to the house sometime after July 2015, but there was no date provided for this occurrence either.[7] Mother also testified that she attempted to visit on at least one other occasion, at which she knocked on the door and left a present for B.C.H. on the porch when the grandparents refused to answer the door.

---

[6] By analogy, this rule would also apply to the three-month period in subsection (B).

[7] Grandmother testified this occurred in May 2016 and generally stated Mother had not seen B.C.H. in almost a year by that point, but there was no specific date provided.

There was evidence that the grandparents made a conscious decision that the parent-child relationship between B.C.H. and his Mother was not in the best interest of B.C.H. and purposefully sought to interfere with the parent-child relationship and even blocked Mother's phone calls. While Grandmother justified their actions by asserting Mother intentionally disobeyed their requests for her to visit in person or by phone at reasonable times, the record fails to show that Mother, through her words or actions, expressed an intent not to return or otherwise abandon her relationship with B.C.H. by remaining away as contemplated by the statute for the requisite time period(s).

We conclude the grandparents failed to establish by clear and convincing evidence that Mother left the child voluntarily and remained away for the requisite time periods or otherwise expressed an intent not to return. *See In re J.G.S.*, 2019 WL 1199521, at *8. Furthermore, we would point out that subsections (A) and (B) have the additional requirement that the child be left with someone "not a parent." *See* Tex. Fam. Code Ann. § 161.001(b)(1)(A), (B). Grandmother's testimony conclusively established that B.C.H.'s father has lived in the home with them, even if they did not have "a true father-type relationship."

Construing all the evidence in the light most favorable to the finding, we conclude a reasonable fact finder could not have formed a firm belief or conviction

19

that its findings were true. Therefore, we conclude the evidence was legally insufficient to support the trial court's finding under section 161.001(b)(1)(A)–(C). *See id.* § 161.001(b)(1)(A)–(C); *In re J.G.S.*, 2019 WL 1199521, at \*8; *In re F.E.N.*, 542 S.W.3d at 762–63; *see also In re J.K.H.*, 2009 WL 2948575, at \*3.

## 2. Predicate Findings under 161.001(b)(1)(D) and (E) - Endangerment

The court also found by clear and convincing evidence that Mother "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child; [and] engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.]" *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E). The Texas Supreme Court has explained that endanger "means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *See Boyd*, 727 S.W.2d at 533 (citing *Allred v. Harris Cty. Child Welfare Unit*, 615 S.W.2d 803, 806 (Tex. Civ. App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.)). Endanger is defined as "expos[ing] to loss or injury; to jeopardize." *Id.* (citation omitted). While both (D) and (E) focus on endangerment, subsection (D) "concerns the child's living environment, rather than the conduct of the parent, though parental

20

conduct is certainly relevant to the child's environment." *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (citations omitted). Whereas "[u]nder subsection (E), the cause of the endangerment must be the parent's conduct and must be the result of a conscious course of conduct rather than a single act or omission." *Id.* (citations omitted).

A predicate finding under subsection (D) may be established by evidence of a child's environment. *In re C.M.C.*, 554 S.W.3d 164, 171 (Tex. App.—Beaumont 2018, no pet.) (citing *In re A.A.L.A.*, No. 14-15-00265-CV, 2015 WL 5437100, at *5 (Tex. App.—Houston [14th Dist.] Sept. 15, 2015, no pet.) (mem. op.)); *In re A.S.*, 261 S.W.3d 76, 83 (Tex. App.—Houston [14th Dist.] 2008, pet. denied)). The evidence provided at the termination hearing indicated that B.C.H. was primarily in an environment with his paternal grandparents. There was evidence that during a scheduled week-long visit, Mother took the child to her family's ranch in 2015, which is outside the geographical boundaries provided in the SAPCR order. Mother testified that while there, the child was in the presence of J.Z. in violation of the trial court's order. However, nothing in the order or the record before us indicates why the order contained the no-contact provision. Mother testified that J.Z. "liked to smoke a lot of weed[.]" Despite J.Z.'s affinity for smoking marijuana, there was no testimony or evidence whatsoever adduced at trial that indicated J.Z. engaged in this

21

conduct during this particular visit or around B.C.H. at any other time. There was nothing in the record from which we can ascertain if this was conduct in J.Z.'s distant past or whether he was actively using drugs around the time of this visit in July 2015.

Grandmother also testified that she overheard a conversation where one of Mother's boyfriends threatened to "kill my son while my grandson was in their possession" which she felt endangered B.C.H.'s well-being. It is unclear from the record who "their" was in this testimony. There is also no testimony or evidence Mother was aware of this threat. Grandmother stated although her testimony might be hearsay, she said when B.C.H. returned from the 2015 visit he complained that he was "attacked by a dog and bit by a pig and saw a dog die[.]" However, there is no indication Mother was aware of any potential danger to the child before these instances occurred or that she knowingly disregarded the potential for danger on her family's ranch and disregarded it. *See In re S.M.L.*, 171 S.W.3d at 472 ("subsection (D) is not a basis for terminating parental rights if the parent was unaware of the endangering environment"). There was no evidence that Mother knew any of these animals were dangerous and consciously disregarded the potential for danger to B.C.H.

"Termination under subsection 161.001(b)(1)(E) must be based on more than a single act or omission—the evidence must demonstrate a voluntary, deliberate, and

conscious course of conduct by the parent." *In re E.R.W.*, 528 S.W.3d 251, 264 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (citing *In re C.A.B.*, 289 S.W.3d 874, 883 (Tex. App.—Houston [14th Dist.] 2009, no pet.)). "Evidence of drug and alcohol abuse can be considered in an endangerment finding." *In re C.M.C.*, 554 S.W.3d at 172; *In re R.W.*, 129 S.W.3d 732, 738–39 (Tex. App.—Fort Worth 2004, pet. denied). In the present case, the evidence presented by grandparents in support of subsection (E) was tenuous at best. Grandmother and Mother testified regarding Mother's probation for a felony offense and violation of the terms of her probation by using drugs and drinking alcohol in July 2016. Mother admitted to the drug and alcohol use on one occasion following the death of a relative, and her probation was extended for two years as a result. This was during a time period when B.C.H. was not in her presence. There was no allegation Mother ever used drugs or was under the influence of drugs while B.C.H. was with her. The evidence showed that since the violation, Mother had complied with every term of her probation. She completed her community service, and she testified she had taken twenty drug tests since the violation and passed them all. The grandparents offered no evidence to contradict this.

While past drug and alcohol abuse may also be considered as part of an ongoing course of conduct that may endanger the child, there was limited testimony

23

at the hearing and no other evidence in the record regarding any past drug use by Mother. When asked whether she was aware if Mother had been in trouble with the law and what she had been arrested for, Grandmother responded, "It was drug paraphernalia, credit card abuse of the elderly. She's, I believe, a felon on that." Although there was testimony regarding the credit card offense which led to her probation, there was no other testimony regarding Mother's arrest for drug paraphernalia or the disposition of such charges.

"[A] parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, may support a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being." *In re R.S.S.*, No. 14-16-00072-CV, 2016 WL 3902446, *5 (Tex. App.—Houston [14th Dist.] July 14, 2016, pet. denied) (mem. op.) (citation omitted). Here, grandparents had already filed their petition for termination when Mother admitted to using drugs in July of 2016, but the record reflects she was not served until February 22, 2017, so there is nothing to indicate she had knowledge of the pendency of the termination suit and the risk of losing her child.

Imprisonment is a factor to be considered by the trial court on the issue of endangerment. *In re E.N.C.*, 384 S.W.3d at 805; *Boyd*, 727 S.W.2d at 533; *In re M.D.S.*, 1 S.W.3d 190, 199 (Tex. App.—Amarillo 1999, no pet.). However, "the

24

commission of any intentional act which results in imprisonment, including violation of probation, is not sufficient grounds, standing alone, for termination." *In re S.Z.G.*, No. 12-02-00081-CV, 2003 WL 21771759, *6 (Tex. App.—Tyler July 31, 2003, pet. denied) (mem. op.) (citing *Mayfield v. Smith*, 608 S.W.2d 767, 771 (Tex. Civ. App.—Tyler 1980, no writ)); *see also In re E.N.C.*, 384 S.W.3d at 805 ("[W]e agree with the court of appeals that deportation, like incarceration, is a factor that may be considered (albeit an insufficient one in and of itself to establish endangerment)"). Mother may have had a pattern and history of drug abuse and incarcerations, but it simply was not in the record before us. The grandparents failed to provide the requisite proof establishing a pattern of conduct by acts or omissions endangering the child. There was no evidence regarding Mother spending any time in jail such that the stability of B.C.H. was jeopardized. *See In re E.N.C.*, 384 S.W.3d at 805 (discussing the father's criminal acts and noting there was "no evidence that these actions created such uncertainty and instability for his children sufficient to establish endangerment"); *In re A.S.*, 261 S.W.3d at 85 (finding evidence legally insufficient to support an endangerment finding and noting the father "was given probation . . . not imprisonment" and "there was no conviction at the time of the termination hearing, and thus, the length of imprisonment, if any, was speculative"). To the contrary, the evidence showed Mother made efforts to comply with her probation

25

following her admitted violation. In large part because B.C.H. has spent the great majority of his life in the home with the grandparents, Mother's isolated incident of drug use violating the terms of her probation, which is all this record revealed, is not sufficient to find by clear and convincing evidence that Mother engaged in a conscious course of conduct endangering her child in violation of subsection (E).

In their brief, the grandparents assert that Mother "took B.C.H. to an adult party where they served 'drinks and stuff like that.'" They also claim Mother returned B.C.H. to the grandparents late after the party. This is a mischaracterization of the record. There were two portions of testimony discussing a birthday party where Mother allegedly arrived late. Grandmother first testified about the party as follows:

> Q: Do you know what I'm talking about? Was there a birthday party visit?
> A: She has come down for a couple of birthday parties we've had. I think it was the one she was late.

Later in the hearing, Mother was asked follow-up questions about the party:

> Q: And what about this time and – there was a party and you came in and didn't spend any time with the child?
> A: No. That party, she said that I was late. I had brought drinks and stuff like that. I did take him with me. They allowed me to have him. Right after the party, we left. I also did try to show up for his birthday. The first year after she – in 2015 – in 2016 for his birthday I had left a present at the door. Nobody would answer the door. It's been

really hard not being able to see him on his birthday. I call, whatever. Like, nothing. I don't get anything. No response, no nothing.

The record is clear that Mother arrived with drinks for the birthday party, but Grandmother told her she was late. However, the grandparents allowed Mother to have possession of B.C.H. for a visit after the party. The record is devoid of any testimony regarding Mother taking B.C.H. to an adult party with alcohol.

Reviewing all the evidence in the light most favorable to the finding, we conclude that no reasonable factfinder could form a firm belief or conviction that Mother engaged in behavior endangering B.C.H. or that Mother engaged in the prohibited acts pursuant to subsections (D) or (E).

### 3. Predicate Finding under 161.001(b)(1)(F) – Non-support

"It is well-settled that a parent has a duty to provide support for her child, even when the parent does not have custody of the child[.]" *In re D.M.D.*, 363 S.W.3d 916, 921–22 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (citing *R.W. v. Tex. Dep't of Protective & Regulatory Servs.*, 944 S.W.2d 437, 440 & n.4 (Tex. App.—Houston [14th Dist.] 1997, no writ)). Another ground the trial court based its termination order on was that Mother "failed to support the child in accordance with the parent's ability during a period of one year ending within six months of the date of the filing of the petition." *See* Tex. Fam. Code Ann. § 161.001(b)(1)(F). The petition for termination in this case was filed on January 8, 2016. Accordingly, the

relevant period is any consecutive twelve-month period between July 8, 2014, and January 8, 2016. *See id.*; *In re D.M.D.*, 363 S.W.3d at 920 (citation omitted). A previous child-support order is no evidence of a parent's ability to pay. *In re D.M.D.*, 363 S.W.3d at 920 (citations omitted); *In re D.S.P.*, 210 S.W.3d 776, 781 (Tex. App.—Corpus Christi 2006, no pet.). The order in the original SAPCR required Mother to pay $100.00 per month in support of B.C.H. Grandmother testified that Mother did not pay any child support until after they filed their original petition for termination and adoption. Mother's first payment was for $75.00 on August 8, 2017.

Despite clear and convincing evidence that Mother failed to provide support, there was no evidence of her *ability* to pay support during the requisite time period. A community supervision record admitted as an exhibit at trial dated May 9, 2016, showed Mother worked at McDonald's, which was not during the relevant time period. Mother testified she began receiving money from oil wells contained on her family's property approximately two months before the termination hearing, which again, was outside the relevant statutory period. Mother testified she was working on her college degree and was not currently employed, and the last time she worked was about one month prior to the termination hearing. Mother indicated she had a job at a nursing home for approximately two and a half years making $8.50 an hour. That meant Mother had been employed at the nursing home since February 2016,

28

which began after the grandparents filed their petition for termination. Again, this is outside the requisite time period. There was no evidence in the record establishing Mother had the ability to pay child support for any consecutive twelve-month period between July 8, 2014, and January 8, 2016. Accordingly, we conclude the evidence was legally and factually insufficient to support the trial court's finding Mother failed to support B.C.H. according to her ability under subsection (F).

While there are indications in the record that Mother made some irresponsible choices, that is not enough. We strictly construe involuntary termination statutes in favor of the parent. *See Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Due to the severity and permanency of the termination of parental rights, the evidence supporting termination must meet the threshold of clear and convincing evidence. Tex. Fam. Code §161.001(b); *In re J.G.S.*, 2019 WL 1199521, at *6. The record in this case simply failed to support the predicate findings outlined in the statute by legally sufficient evidence. Conclusory testimony, even if uncontradicted, does not satisfy the clear-and-convincing evidence standard applied to parental termination cases but amounts only to conjecture. *See In re D.N.*, 405 S.W.3d 863, 878–79 (Tex. App.—Amarillo 2013, no pet.). Grandmother made only conclusory allegations regarding the predicate acts, but Grandmother failed to support the conclusory allegations in her testimony with facts or details that would establish Mother's

29

leaving was voluntary, the necessary timelines, that Mother engaged in a course or pattern of conduct that endangered B.C.H., or that established Mother had the ability to pay child support. Viewing the evidence in the light most favorable to the trial court's finding, we conclude no reasonable trier of fact could have formed a firm belief or conviction in the truth of its findings. *See In re J.F.C.*, 96 S.W.3d at 266. Therefore, the evidence was legally insufficient to support the findings that Mother committed the predicate acts outlined in Texas Family Code section 161.001(b)(1)(A)–(F). *See id.*; *see also* Tex. Fam. Code Ann. § 161.001(b)(1)(A)–(F).

**B. Issue Two: Legal and Factual Sufficiency to Support Best Interest Finding**

The nonexclusive factors courts consider when determining the best interest of the child include:

> (A) the desires of the child; (B) the emotional and physical needs of the child now and in the future; (C) the emotional and physical danger to the child now and in the future; (D) the parental abilities of the individuals seeking custody; (E) the programs available to assist these individuals to promote the best interest of the child; (F) the plans for the child by these individuals or by the agency seeking custody; (G) the stability of the home or proposed placement; (H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (I) any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted). When conducting a best interest analysis, courts may consider circumstantial evidence,

30

subjective factors, and the totality of the evidence as well as the direct evidence. *In re B.R.*, 456 S.W.3d 612, 616 (Tex. App.—San Antonio 2015, no pet.) (citation omitted). "A trier of fact may measure a parent's future conduct by his past conduct and determine whether termination of parental rights is in the child's best interest." *Id.* (citation omitted). The same evidence proving acts or omissions under section 161.001(b)(1) may be probative of the child's best interest. *In re C.H.*, 89 S.W.3d at 28 (citations omitted). There is a strong presumption the child's best interest is served by keeping the child with their natural parents, and the party seeking termination must rebut that presumption. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006).

**1. Desires of the Child**

There was no evidence regarding the child's desires in this case, apart from Grandmother's testimony that B.C.H. never asked about his mother or asked to see her. Grandmother also admitted she did not tell B.C.H. about Mother's phone calls or voicemails. Grandmother acknowledged that B.C.H. previously enjoyed his visits with Mother. Due to a lack of testimony regarding the child's current desires, we do not consider this factor as weighing in favor of or against termination in this case.

31

**2. Physical and Emotional Needs**

Parental rights are not absolute, and it is essential that the emotional and physical needs of the child not be sacrificed merely to preserve those rights. *In re C.H.*, 89 S.W.3d at 26. While there was testimony that B.C.H. previously needed dental work, there was no testimony regarding his ongoing physical or emotional needs.

The ad litem's report stated the following:

> On one hand, if termination is NOT granted[,] the child will remain safe in the care of the grandparents who should be awarded sole managing conservatorship and the mother's possession supervised by the paternal grandparents, as well as adjusting child support guidelines. *There is no foreseeable harm if the mother's rights were to remain intact.*
> *On the other hand[,] if termination is granted, it carries with it possible psychological ramifications that could affect the child for his lifetime.* Termination would allow the child the finality and closure that the statute contemplates. It would also provide the child any benefits derived from the grandparents once they adopt, such as Social Security or other financial benefits.

(Emphasis added.)

Based on the ad litem's report, this factor weighs against termination. *See Yonko v. Dept. of Family and Protective Servs.*, 196 S.W.3d 236, 246 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (noting this factor weighing against termination given child's emotional need for his mother and based on lack of evidence of emotional or physical abuse or neglect by the mother).

### 3. Parental Abilities

While there was ample evidence of Mother's poor choices, there was no evidence regarding her interactions with her child. There was also no evidence presented that Mother had any involvement with criminal activity or drugs subsequent to her admitted probation violation in 2016. Grandmother also complained that she felt Mother told B.C.H. things that were in appropriate based on the stories B.C.H. would tell when he returned home but provided no details. In *Turner v. Lutz*, our sister court in Austin reversed a termination based on the best interest finding after determining the evidence was insufficient. 685 S.W.2d 356, 361 (Tex. App.—Austin 1984, no writ). The Court explained,

> [w]e note that evidence of appellant's alcohol problem or his misdemeanor DWI conviction did not include any showing of emotional or physical danger to his children, which in our view would be sufficient to support termination. Appellant's statement to his son that his mother was pregnant when they married, although reprehensible, justified the trial court's strong censure but alone would not be sufficient to support termination. The record indicates to us that the children's mother after the divorce and her remarriage, made vistitation from the children's natural father next to impossible. Appellant was never permitted to have his children with him, but was only allowed to see them in the appellees' home. Letters and cards addressed from him to his children were not given to his children but were returned unopened. When the mother and her new husband moved from Bell County to El Paso, their unlisted telephone number prevented appellant from communicating with his children.

*Id.* at 360.

33

The ad litem's report in this case states there would be "no foreseeable harm if the mother's rights were to remain intact." The current arrangement included limited visitation between Mother and B.C.H., which the ad litem indicated would be appropriate. The grandparents stopped all contact with Mother following the 2015 visit. Mother testified she cut off all contact with J.Z. within a few weeks of the July 2015 visit and had not seen him since, and Grandmother made no attempt to dispute her testimony.

Mother had recently married, owns a home, is receiving money from oil wells on her family's property, is financially stable, and is pursuing her accounting degree. Mother did not and had not taken care of B.C.H.'s daily needs or participated in his activities, rather this was handled by the grandparents; however, Mother was not requesting as relief that B.C.H. be allowed to live with her. Nothing in this record indicates Mother lacked the parental abilities to maintain monthly visits with her child. This factor weighs against termination.

**4. Programs Available**

This best interest factor did not weigh in favor for or against termination, as both Mother and Grandmother testified that programs were available to assist B.C.H. with his college education later. Mother testified that B.C.H. would have benefits for his education through his stepfather, who was a veteran. Grandmother testified

that if they were allowed to adopt B.C.H., he would qualify for assistance with college through the Hazelwood Act.

### 5. Plans for the Child

Grandmother testified they wanted to adopt B.C.H. and had plans to enroll him in normal activities, like piano lessons. Mother testified that she just wanted to be a part of his life and attend events. Mother did not have any plans to be a daily fixture in B.C.H.'s life, rather she testified specifically that she felt visitation once a month would be appropriate and did not feel visitation twice a month would be possible given the distance. Mother's testimony also established that she had no desire to disrupt B.C.H.'s stable, home environment with his grandparents. Reference to the ad litem's report is again appropriate under this factor, which we conclude weighs against termination.

### 6. Stability of the Home

The stability of the proposed home environment is an important consideration in determining whether termination of the mother's rights is in B.C.H.'s best interest. *See In re J.E.M.M.*, 532 S.W.3d 874, 889 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (citing *In re D.M.*, 452 S.W.3d 462, 472 (Tex. App.—San Antonio 2014, no pet.)). "[A] paramount consideration in the best-interest determination [is] the child's need for permanence through the establishment of a 'stable, permanent

35

home.'" *Id.* (quoting *In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.).

In the present case, there was testimony B.C.H. lived with the grandparents for ten out of his ten and a half years. Grandmother indicated B.C.H. had friends over and participated in extracurricular activities. She also told the court that B.C.H. was very happy, in a stable environment, and was thriving. Mother indicated she was not surprised B.C.H. was doing well with his grandparents as his caregivers "[b]ecause he's in a stable environment" and "[b]ecause they have been there." Mother and her husband testified they had their own home, and she recently quit her job to complete her online accounting degree.

However, some improvement in a parent's situation does not necessarily mean the evidence is insufficient to support termination is in the best interest of the child. *See In re D.M.*, 452 S.W.3d at 473–74 (noting "a parent's improvement in behavior does not totally offset instability and harmful behavior in the past"); *In re J.T.K.*, No. 12-13-00339-CV, 2014 WL 1093086, at *9 (Tex. App.—Tyler March 19, 2014, no pet.) (mem. op.) (upholding termination although the mother had improved her circumstances by staying sober for a year and a half, completing treatment, and completing tasks on her service plan). Although Mother violated the trial court's SAPCR order leading the grandparents to suspend her visitation in 2015 and

admitted to cocaine use on one occasion in violation of her deferred adjudication in 2016, the court did not adjudicate. The evidence did not establish Mother was currently involved in drugs or that she had any instances of drug use following the admitted violation in 2016 and failed to establish she had any criminal convictions. There was no evidence or allegation Mother's husband ever had any involvement with drugs or criminal activity. We feel this factor weighs against termination.

### 7. Parental Acts or Omissions/Excuses

"A parent's inability to provide adequate care for a child, lack of parenting skills, and poor judgment may be considered when looking at the child's best interest." *In re B.H.R.*, 535 S.W.3d 114, 123 (Tex. App.—Texarkana 2017, no pet.) (citing *In re C.A.J.*, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth 2003, no pet.)). The testimony was clear that Mother did not regularly exercise her visitation rights with B.C.H., even when she had them. However, the evidence revealed she lived almost five hours away and did not have a driver's license or own a car, which made exercising her visitation challenging. Mother explained it was difficult to find a place stay for a week while she visited B.C.H. without paying for a hotel.

Although Mother contends the grandparents kept her from seeing B.C.H., Mother willfully disregarded a court order knowing the consequence could be suspension of her visitation rights. She offered no excuse for doing so, and she

37

admitted it was wrong. Mother's actions led to the suspension of visitation with her child, and although she failed to go to the court to have her visitation rights reinstated, there was evidence she attempted to visit B.C.H. on more than one occasion following the suspension of her visitation and that she consistently called him. The grandparents refused to tell B.C.H. his Mother called or give him her voicemails after 2015, even though she made calls up until shortly before trial. Mother admitted that even though she knew she was not supposed to take B.C.H. out of a specific area during scheduled visits, she did so, and then lied to the grandparents about it. She asserted that she wanted to take B.C.H. to visit her mother, but the grandparents would not allow this, which was why she took B.C.H. to San Antonio.

There was evidence that Mother was on deferred adjudication for a felony offense, and she admitted to one incident of cocaine use while on probation. This resulted in the extension of her probation by two years.

Mother's excuse for her failure to consistently support B.C.H., was that she went through "hard times" and she "wasn't in the right state of mind[.]" Mother testified she began receiving money from oil wells on her family's ranch, and as of the time of trial had completely caught up on her child support payments. "A fact finder may infer from a parent's past inability to meet a child's physical and

38

emotional needs an inability or unwillingness to meet a child's needs in the future." *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

We conclude this factor does not weigh strongly in favor of or against termination of Mother's rights. *See Yonko*, 196 S.W.3d at 248 (explaining that where parent made an ability to improve their parenting abilities for the future, the termination of their rights cannot be upheld "merely because the excuses for [their] acts and omissions are inadequate").

**8. Overall Assessment of Best Interest**

After analyzing the record as a whole and considering the relevant non-exhaustive *Holley* factors, we conclude the trial court could not have formed a firm belief or conviction that termination was in the best interest of B.C.H. *See In re J.F.C.*, 96 S.W.3d at 266. Despite Grandmother's allegation that termination was in the best interest of B.C.H., the evidence disputing that in this case, particularly the ad litem's report, was substantial. The fact that the ad litem opined there was "no risk of foreseeable harm" if the court allowed Mother to retain her rights and the child would "remain safe in the care of the grandparents," but termination "carries with it possible psychological ramifications that could affect the child for his lifetime" is so significant that a reasonable fact finder could not have resolved the disputed evidence in favor of its finding. *See id.* Although there was some evidence

of Mother's poor choices, the evidence established she had bettered her circumstances through education, not committing further probation violations, having a home, and marriage. This evidence, coupled with the ad litem's report, was overwhelming against the trial court's finding that termination was in B.C.H.'s best interest. Therefore, we conclude the evidence is factually insufficient to support the trial court's finding that termination of Mother's parental rights is in the best interest of B.C.H. by clear and convincing evidence. *See id.*

Weighing the factors for and against termination, we hold the evidence is factually insufficient to support termination of Mother's parental rights by a clear and convincing standard since: (1) the ad litem's report acknowledged termination carried the risk of life-long psychological ramifications for the child, yet there was no foreseeable risk if the court allowed Mother to retain her rights; and (2) the grandparents presented scant evidence the trial court could credit as Mother's future inability to meet the needs of her child under the Holley factors to overcome the ad litem's assessment of the emotional risk to the child. *See Yonko*, 196 S.W.3d at 249 (citing *In re K.C.M.*, 4 S.W.3d 392, 394–95 (Tex. App.—Houston [1st Dist.] 1999, pet. denied)).

The relationship of a parent and their child is one of constitutional dimensions. *Wiley v. Spratlan*, 543 S.W.2d 349 (Tex. 1976). There is a strong presumption in

favor of maintaining that relationship. *In re R.R.*, 209 S.W.3d at 116. While we acknowledge Mother made some poor choices, we have grave concerns about permanently and irrevocably terminating a parent's rights on a record so scant as this. Despite some evidence of Mother's poor choices, that evidence did not prove the statutory elements on which the trial court based this termination as it did not establish voluntariness, requisite timelines that Mother remained away, that Mother engaged in a pattern or course of conduct endangering her child, that Mother placed the child in an environment that endangered him, or her ability to pay. Because no reasonable factfinder could have formed a firm belief or conviction Mother committed the predicate violations, we conclude the evidence was legally insufficient to support the trial court's findings. Additionally, there was factually insufficient evidence to support that termination was in the child's best interest in this case. We must strictly construe involuntary termination statutes in favor of the parent. *See Holick*, 685 S.W.2d at 20.

In light of our resolution of issues one and two, we do not address Mother's third issue as it would afford her no greater relief on appeal.

### IV. Conclusion

We conclude the evidence was legally insufficient to support the trial court's findings that mother committed predicate acts in section 161.001(b)(1)(A) through

41

(F) by clear and convincing evidence. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(A)–(F). We also conclude the evidence was factually insufficient to support the trial court's finding that termination was in the best interest of the child. *See id.* § 161.001(b)(2). We reverse the portion of the trial court's order terminating Mother's parental rights and render judgment that Mother's parental rights are restored.

REVERSED AND RENDERED IN PART.

          _____

          CHARLES KREGER
          Justice

Submitted on March 13, 2019
Opinion Delivered May 2, 2019

Before McKeithen, C.J., Kreger, and Johnson, JJ.