**Affirmed and Memorandum Opinion filed March 30, 2023.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-22-00822-CV

---

### IN THE INTEREST OF L.S.S., A/K/A L.S.G., A CHILD

---

**On Appeal from the 314th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2020-00921J**

---

### MEMORANDUM OPINION

Appellant M.F.G. ("Mother") appeals the trial court's order terminating her parental rights to her child, L.S.S. a/k/a L.S.G. ("L.S."). In one issue, Mother argues the evidence is legally and factually insufficient to support the trial court's finding that termination was in L.S.'s best interest. We affirm.

### I. BACKGROUND

#### A. REMOVAL[1]

On January 15, 2020, Texas Department of Family and Protective Services

---

[1] These facts are taken from the Department's affidavit for removal, which was admitted

("the Department") received a referral alleging Mother's neglectful supervision of L.S., who was six years old at the time. The referral alleged that Mother was arrested for assaulting her roommate, Araso Muhammad ("Muhammad"), by hitting Muhammad with a candle and causing wax to burn his face. Mother also attempted to grab a knife during the altercation but Muhammad prevented her from doing so.

Three weeks later, Muhammad found the front door to the apartment locked and could hear Mother screaming inside. The fire department was called, forced entry into the home, and found Mother intoxicated with L.S. present. On April 6, 2020, the Department received a second referral alleging neglectful supervision by Mother, indicating that Mother was charged with aggravated assault with a deadly weapon (a knife) of Muhammad. Mother informed the Department that there were no family members in Texas to take care of L.S., and L.S.'s father was in Ethiopia.

During its investigation, the Department learned that Mother is from Ethiopia and that L.S. was born in the state of Georgia. Mother informed the Department that L.S. did not attend school at the time, that she was not currently employed, and that she provided for him "because her friends assist her." L.S. appeared healthy and had no marks or bruises on him.

As to the altercation between Mother and Muhammad in January 2020, Mother informed the Department that she struck Muhammad with a candle because she believed he was "coming at her" after he threw her phone against the wall. Mother denied that she attempted to grab a knife, threw a glass at Muhammad, or was romantically involved with him. Muhammad told the Department that Mother and L.S. had been living with him for approximately four months and that he was helping Mother and L.S. by giving them a safe place to stay. Muhammad explained

into evidence at the final hearing.

2

that L.S. was not present during his altercation with Mother because L.S. ran into another room and locked the door.

On January 20, 2020, the Department prepared a safety plan with Mother and Muhammad, which provided that, in order for L.S. to return to the home, one of them needed to leave; Muhammad agreed to move from the apartment. Three days later, when a Department's investigator visited the home, Mother informed the Department that Muhammad was still living in the apartment.

On April 6, 2020, during another visit by a Department's investigator, Muhammad informed the Department that Mother had "been nothing but trouble" during the nine months she and L.S. had stayed with him. Muhammad explained that he called law enforcement "several times" due to Mother assaulting him and destroying his property. Muhammad informed the Department about the April 2020 incident where Mother grabbed a knife from behind her back after they began to argue, resulting in Mother being arrested and law enforcement taking L.S.

On April 7, 2020, the Department filed a petition for the protection and conservatorship of L.S. and for the termination of Mother's parental rights. The Department's live pleading sought the termination of Mother's parental rights on statutory predicate grounds (D), (E), (K), (N), and (O). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (K), (N), (O), (b)(2).

## B.    FINAL HEARING

The final hearing on the Department's petition began on August 2, 2022.[2] In relevant part, the trial court heard testimony from the Department's caseworker assigned to the case, Jasmine Smith ("Smith"); Mother; L.S.'s foster mother; and

---

[2] The reporter's record indicates that the final hearing that is the subject of this appeal occurred after the trial court granted Mother's motion for new trial following a prior final hearing.

Muhammad.

### 1.    Smith

Smith testified that L.S. was nine years old at the time of the final hearing and had lived in a foster home for over two years, beginning in April 2020. Smith stated L.S.'s foster mother met his physical and emotional needs and sought to adopt him.

According to Smith, when L.S. was placed into foster mother's care, he spoke "little words"; was unable to read, write, or do any basic math; was "very timid, very shy, no engagement"; and was not "developmentally there." L.S.'s medical records noted that his "standard scores indicate a significant discrepancy between his functional communication skills and his chronological age when compared to his same age, typically developing peers."[3] At the time of trial, however, "he speaks, he talks, he engages"; he is doing well in school; he can count; and he is "[v]ery outgoing."

L.S.'s medical records indicate that he was also diagnosed with radioulnar synostosis to both his arms, and a vertebral anomaly.[4] Smith testified that these medical conditions required multiple doctor visits while L.S. was in foster mother's care and will require multiple medical visits in the future. Smith explained L.S. had two surgeries to correct the length of his arms; that L.S. needs a caregiver who is understanding and willing to take L.S. to get medical care; and that L.S. is doing very well since coming into the Department's care. Smith stated that failing to

---

[3] L.S.'s extensive medical records from his time in foster mother's care were admitted into evidence at the final hearing.

[4] "Radioulnar synostosis is a rare condition in which the bones of the forearm—the radius and the ulna—are abnormally connected. This limits the rotation of the arm." Radional Synostosis, BOSTON CHILDREN'S HOSPITAL, https://www.childrenshospital.org/conditions/radioulnar-synostosis#:~:text=Radioulnar%20synostosis%20is%20a%20rare,a%20forearm%20fracture%20or%20trauma (last visited March 7, 2023). L.S.'s medical records provide that he has "C5-6 block vertebra with narrowed AP vertebral body width and fused lateral masses and posterior elements."

address the conditions of L.S.'s arms endangered his emotional and physical well-being, and the medical records indicate that the condition of his arms impaired the functionality of his hands and arms. Smith did not believe Mother was capable of addressing L.S.'s medical needs and stated that Mother did not understand the severity of L.S.'s medical diagnosis. L.S. was also diagnosed with disruptive mood dysregulation disorder, attention deficit hyperactivity disorder, and psychosocial and contextual factors. L.S. had been in individual therapy for the past year, was taking medication, and had improved psychologically.

Smith explained all of her interactions with Mother were carried out with the help of an interpreter and that Smith never had a conversation with Mother in English. Smith believed that Mother understood what the Department was trying to accomplish for L.S. and disagreed that Mother never understood the proceedings due to a language barrier. She also testified that she believed Mother was willing to do the required services but lacked the understanding of what was required to complete them.

The Department's family service plan required Mother to complete a Batterers Intervention and Prevention Program ("BIPP"), individual therapy, anger management counseling, and a psychological evaluation; to maintain stable housing, stable employment and stable income, and a working telephone; and to abstain from criminal activity. Smith stated that Mother failed to maintain stable housing, complete BIPP or therapy, or provide proof of employment. However, Smith explained that Mother did not complete the BIPP because she did not have a reliable person who could interpret for her.[5] Smith further stated that Mother completed the

---

[5] Mother's family service place required her to complete BIPP. Although Mother completed the assessment, Mother did not complete any of the eighteen sessions recommended for her to complete BIPP.

psychological evaluation, maintained a working telephone throughout the case, and engaged in individual therapy but was unsuccessfully discharged for failing to attend the appointments.[6] She further testified Mother completed the parenting classes, but did not learn anything from them.

Smith also testified that Mother had at least fifteen visits with L.S. during the pendency of the case; that Mother did not behave appropriately during approximately twelve of those visits; and that Mother also called L.S. "a lot" and L.S. always wanted to talk to Mother. Smith stated the phone calls sometimes went well and sometimes did not. Smith explained that Mother behaved inappropriately by trying to force feed L.S. during the visits when he was not hungry, by attempting to remove L.S.'s clothing with scissors, and by physically trying to take L.S. with her after a visit. Smith also stated that Mother's behavior upset L.S. and at times, caused Smith to fear for her own safety.

Smith visited Mother's home where she and Muhammad lived. Smith testified Mother could not provide L.S. with a safe environment, that Mother had no support system apart from Muhammed, and that Mother was unable to obtain her own apartment. She also performed a search of the school records and found Sutton Elementary the only school where L.S. had been enrolled in Texas prior to being in the Department's care.

Smith stated that L.S. never talks about Mother, that he is happy, and that he wants to stay at the foster home. When Smith had conversations with L.S. concerning where L.S. wished to live, L.S. never stated that he wished to live with Mother but he expressed he would like to visit Mother and did not express a fear

_____

[6] Smith testified that Mother would "confirm that she [would] attend the appointments, and then when it came time for the appointments, Mother would not attend."

6

about returning to Mother.

When asked why termination was in L.S.'s best interest, Smith testified:

The child has been in the home since April of 2020. He has bonded and created a great relationship with the foster parent and as well as the other adoptive children that are in the home that the foster parent has adopted herself. And the foster parent is doing a great job in making sure that he is developmentally on target, meeting his medical needs. Because the arm surgery is just the first of many health issues that she would have to have addressed. And returning him back to his mother, it just wouldn't be in the best interest of the child at this time.

. . . .

It wouldn't be in the best interest of the child to go back to the mother due to the medical concerns with the child. The medical needs being met in the foster home, it is ensuring that he is growing as needed. In the case that it was never treated, the child would have severe -- he would be in pain as an adult, as a teenager. He wouldn't be able to fully engage in sports, working. He would practically be handicapped if he did not get the surgeries that are needed. He's thriving in the [foster] home. It's just due to the mother's unstability (sic) of us not knowing where she stays, it wouldn't be in the best interest for a child developmentally, emotionally and physically.

Smith further testified that placing L.S. with Mother was not in L.S.'s best interest because of Mother's abusive conduct towards others and her aggressiveness. Smith explained that Mother "can have outbursts at any given moment" and recounted that Mother hit Smith's ponytail the first time Smith met Mother. Smith also stated that a major concern for the Department was housing because Mother was unable to get her own apartment and, due to Mother's instability, the child would move frequently between apartments. Smith conceded that there are other ways to ensure that L.S. has a safe environment apart from terminating Mother's parental rights, including the Department maintaining permanent managing conservatorship of L.S.

Smith explained that foster mother wanted Mother's visitations to end because L.S. acted out at home afterwards, including by hitting one of the other children in

7

the foster home[7] and by placing a belt loosely around his own neck before falling asleep. After Mother's visitation with the scissors, her visits were suspended until her goodbye visit in October 2021, which she attended with Muhammad. When the Department sought to take L.S. at the end of the goodbye visit, Muhammad stated he was "willing to sacrifice himself for the child because it was unfair," which Smith interpreted as a suggestion that Muhammad was going to kill himself.

Smith explained L.S. has a good relationship with the other children in the foster home and that he considers them his brothers and sisters. Smith explained the foster mother was not Ethiopian but that the foster mother had taken L.S. to an Ethiopian restaurant and kept up with Ethiopian events in the neighborhood. Smith stated that "the foster parent, her religion and the Ethiopian culture are kind of similar or one in the same, so [L.S. is] not really missing out on a lot of the Ethiopian culture." Smith stated that Mother was informed that L.S. was inappropriately touched by another child in the foster home when he was seven in June of 2021 and that an investigation was conducted.[8]

## 2. Foster Mother

L.S.'s foster mother testified that she would like to adopt him because he is a wonderful, jovial child who wants to learn and because it would be in L.S.'s best interest. Foster mother stated L.S. was thin when he came into her care and unable to read and write but is now able to.

According to foster mother, Mother's visits were ended because foster mother found L.S. asleep on the floor of his bedroom with a belt around his neck after one

---

[7] Smith also testified that L.S. had also hit other children in the foster home prior to the time Mother was allowed to visit L.S.

[8] No additional testimony or details was admitted regarding this allegation, nor does Mother reference this allegation in her appellate brief.

of Mother's visitation. Foster mother stated that the belt was not tightly around L.S.'s neck and that L.S. told her he did not remember putting the belt on his neck. The foster mother explained that L.S. used to urinate on himself after visits with Mother but that the behavior stopped once Mother's visits were discontinued. Foster mother testified that she does not know Mother and has no problems with her; however, L.S.'s therapist did not like the possibility of foster mother being L.S.'s permanent managing conservator while Mother visited L.S. once a month. Foster mother did not believe it was in L.S.'s best interest to have Mother visit him once a month, but foster mother testified that she would like to include Mother in L.S.'s life at some future date if Mother was deemed medically sound.

Foster mother testified that L.S.'s medical conditions are birth defects and that procedures performed on L.S.'s arms should have been performed long before he came into her care. She further stated that L.S. will need additional procedures on his back and feet to make sure that he is not walking in pain for the rest of his life.

As to his Ethiopian heritage, foster mother testified that she takes L.S. to different restaurants to maintain contact with his heritage; that she was planning a trip to Africa in December 2022; and that "[t]here are many things about our cultures that are the same." Foster mother believes that termination of Mother's parental rights is in L.S.'s best interest.

### 3. Mother

Mother testified she moved to Houston with L.S. around 2018 or 2017 when he was six years old. Mother testified she lived at the same residence for three years and that Muhammad paid for the apartment and most of the bills but that she contributed sometimes if needed. Mother testified that her family is in Ethiopia and would not be here to help if something happened to her, but that there are people who would support her and could help with L.S. here. She stated that she works

9

maybe three days a week, sometimes by cleaning houses, making approximately $300 per month; that L.S.'s monthly necessities cost her around $200 per month; and that she has a driver's license and access to a vehicle but does not own a car.

According to Mother, L.S. was enrolled in school when they arrived in Houston, but L.S. stopped attending school in January 2020 because of the corona virus. Mother stated that she moved apartments around December 2019 and L.S. was not registered at the school assigned to their new address and that L.S. "was not pursuing school." Mother testified that L.S. had attended pre-school but did not recall the name of the pre-school or his school. Mother testified that L.S. knew the alphabet, colors, and how to count to 100 prior to going into the Department's care.

Concerning L.S.'s medical history, Mother testified that he had an unidentified doctor in the past but that the doctor has since moved, and that she would have to find him another doctor. When asked whether Mother understood that L.S. has additional medical needs, Mother answered that L.S. was never sick when under her care and that he was up to date on his vaccinations when he went into the Department's care. Mother stated that if L.S. is returned to her and needs additional medical attention, then she will have to take him, but that previously doctors told her L.S. was healthy and that "he was born like that." Mother stated she did not know what to do about L.S.'s birth defects and that she was only told L.S. was born that way "so that's all I did." However, Mother acknowledged that L.S. had been unable to stretch his arms out properly and that doctors told her when L.S. was younger that L.S. "had some bone problem." When asked whether Mother had approached a medical doctor to inquire as to what to do about L.S.'s birth defects, Mother stated "No, I didn't do much."

Mother testified she obtained a two-bedroom apartment with a bed for L.S., as the Department requested of her, and that she attended some sessions concerning

10

anger management but also that she did not "go over there" and did not go to the class. Mother also did not recall completing parenting classes but remembered "things that I did over the phone." Mother stated she completed the services she was able to complete without an interpreter and agreed that it would be "a good idea" to engage in family therapy with L.S. in the future to reintegrate him into her life.

Mother explained that the clothes L.S. wore during visitations were "dirty old clothes" and appeared to have come from the trash. Mother denied using scissors to take of L.S.'s clothes, but stated she did take the clothing off and threw it in the trash and that she had a couple of bags of clothes that she wanted to dress him in Mother stated that L.S. was "not happy" when she took off his clothes, but that he did not cry and "was laughing a lot." Mother also denied assaulting Smith and threatening Muhammad with a knife; instead, Mother testified that she was using a knife while chopping food when Muhammad and she were arguing and that Mother simply told Muhammad to stay away from her and she "was just swinging it."

### 4. Muhammad

Muhammad testified that he and Mother had been roommates for three-and-a-half years. He recounted that Mother threatened him with a knife in April of 2020 and that he hit her hand causing the knife to fall. Muhammad testified Mother had never hit him and that they had never been in a fight.

According to Muhammad, Mother was always with L.S., but he did not know the school L.S. attended. He stated L.S. knew the alphabet and colors. Finally, Muhammad denied making any statements concerning self-harm at the goodbye visit between Mother and L.S.

## C. TRIAL COURT'S RULING

On October 13, 2022, the trial court signed a final decree terminating Mother's

11

parental rights to L.S., finding that termination of Mother's parental rights was proper under predicate grounds (D), (E) and (O) and in L.S.'s best interest.[9] This appeal followed.

## II. DISCUSSION

In one issue, Mother argues the evidence was legally and factually insufficient to support the trial court's finding that the termination of Mother's parental rights was in L.S.'s best interest.

### A. APPLICABLE LAW & STANDARD OF REVIEW

Involuntary termination of parental rights involves fundamental constitutional rights and divests the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit from the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *see Stantosky v. Kramer*, 455 U.S. 745, 753 (1982). "Termination of parental rights, the total and irrevocable dissolution of the parent-child relationship, constitutes the 'death penalty' of civil cases." *In re K.M.L.*, 443 S.W.3d 101, 121 (Tex. 2014) (Lehrmann, J., concurring). Accordingly, termination proceedings must be strictly scrutinized. *Id.* at 112. In such cases, due process requires application of the "clear and convincing" standard of proof. *Id.* (citing *Stantosky*, 455 U.S. at 769; *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002)).

"'Clear and convincing evidence' means a 'measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) (per curiam) (quoting Tex. Fam. Code Ann. § 101.007); *see In re K.M.L.*, 443

---

[9] The trial court also terminated the parental rights of L.S.'s father. Father did not file an appeal challenging the termination of his parental rights.

12

S.W.3d at 112–13 ("In cases requiring clear and convincing evidence, even evidence that does more than raise surmise and suspicion will not suffice unless that evidence is capable of producing a firm belief or conviction that the allegation is true.").

The trial court may order the termination of the parent-child relationship if the court finds by clear and convincing evidence that: (1) the parent committed an act or omission described by Family Code § 161.001(b)(1) and (2) termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b); *In re N.G.*, 577 S.W.3d at 232. "To affirm a termination judgment on appeal, a court need uphold only one termination ground—in addition to upholding a challenged best interest finding—even if the trial court based the termination on more than one ground." *In re N.G.*, 577 S.W.3d at 232; *see* Tex. Fam. Code Ann. § 161.001(b).

*Legal Sufficiency*

In a legal sufficiency review, a court views the evidence in a light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d at 266. To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, reviewing the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *Id.* A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been not credible. *Id.* This does not mean that a court must disregard all evidence that does not support the finding. *Id.* Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence. *Id.* If, after conducting its legal sufficiency review of the evidence in the record, a court determines that no reasonable factfinder could form a firm belief or

conviction that the matter that must be proven is true, then the court must conclude that the evidence is legally insufficient. *In re J.F.C.*, 96 S.W.3d at 266–67.

*Factual Sufficiency*

In a factual-sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable fact finder could not have resolved it in favor of the finding. *In re A.C.*, 560 S.W.3d at 631. Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true. *Id.*

## B.   BEST INTEREST FINDING

"The best-interest prong of the termination inquiry 'is child-centered and focuses on the child's well-being, safety, and development." *In re J.W.*, 645 S.W.3d 726, 746 (Tex. 2022) (quoting *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018)). There is a strong presumption that the best interest of a child is served by keeping the child with a natural parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam) (citing Tex. Fam. Code Ann. § 153.131(b)). However, prompt and permanent placement of a child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a). The considerations the factfinder may use to determine the best interest of the child, known as the *Holley* factors, include:

(1) the desires of the child;

(2) the present and future physical and emotional needs of the child;

(3) the present and future physical and emotional danger to the child;

(4) the parental abilities of the person seeking custody;

(5) the programs available to assist the person seeking custody in promoting

the best interest of the children;

(6) the plans for the child by the individuals or agency seeking custody;

(7) the stability of the home or proposed placement;

(8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and

(9) any excuse for the parent's acts or omissions.

*See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also* Tex. Fam. Code Ann. § 263.307(b) (listing factors to be considered in evaluating "whether the child's parents are willing and able to provide the child with a safe environment"). A best-interest finding does not require proof of any unique set of factors or limit proof to any specific factors. *See Holley*, 544 S.W.2d at 371–72.

In reviewing the legal and factual sufficiency of the evidence to support the trial court's finding on best interest, we are mindful that the focus in a best-interest analysis is not only on the parent's acts or omissions, but also on the nature of the relationship the children have with the parent. *See In re E.N.C.*, 384 S.W.3d 796, 808 (Tex. 2012).

### 1. The Desires of The Child

Smith testified that L.S. wanted to remain with foster mother and did not want to return to live with Mother, but that L.S. did wish to maintain contact with Mother. No evidence was presented indicating that L.S. desired the termination of his relationship to Mother. *See In re T.S.*, *In re T.S.*, No. 01-22-00054-CV, 2022 WL 4474277, at *20 & n.39 (Tex. App.—Houston [1st Dist.] Sept. 27, 2022, no pet.) (mem. op.) ("Although the Child Advocates report states that the children had 'verbalized wanting to be adopted by and stay[] with their grandparents fulltime,' this is not evidence that the children desired the termination of their relationship with

15

mother . . . ."); *In re M.A.A.*, No. 01-20-00709-CV, 2021 WL 1134308, at *21 (Tex. App.—Houston [1st Dist.] Mar. 25, 2021, no pet.) (mem. op). Furthermore, there is evidence that Mother and L.S. were bonded and that Mother attended the visits she was allowed to have with L.S. throughout the case. *See In re M.A.A.*, 2021 WL 1134308, at *21. However, while a child's love for their parent is a very important consideration in determining the best interest of the child, it cannot override or outweigh evidence of danger to the child. *In re F.M.E.A.F.*, 572 S.W.3d 716, 732 (Tex. App.—Houston [14th Dist.] 2019, pet. denied).

### 2. The present and future physical and emotional needs of the child; the present and future physical and emotional danger to the child

A child's basic needs include medical and dental care. *In re M.A.A.*, 2021 WL 1134308 at *23. Thus, the trier of fact may consider evidence that a parent neglected to seek appropriate medical care for her child. *Id.*; *see In re J.R.W.*, No. 14-12-00850-CV, 2013 WL 507325, at *9 (Tex. App.—Houston [14th Dist.] Feb. 12, 2013, pet. denied) (mem. op.); *see also* Tex. Fam. Code Ann. § 263.307(b)(12)(A), (F). Additionally, the trier of fact may infer from a parent's past inattention to her children's medical needs that such inattention will continue in the future. *In re M.A.A.*, 2021 WL 1134308, at *23; *see In re L.G.R.*, 498 S.W.3d 195, 205–06 (Tex. App.—Houston [14th Dist.] 2016, pet. denied).

Here, evidence was presented that (1) L.S. needed specialized support and medical care to be fully functional physically at the present time and to be free from pain and physical limitations later in life; and (2) Mother had neglected L.S.'s disabling medical conditions his entire life. *See In re V.A.*, 598 S.W.3d 317, 333 (Tex. App.—Houston [14th Dist.] 2020, pet. denied). Mother testified that she did not do much concerning L.S.'s "bone problem," and the medical records indicate that L.S.'s medical conditions limited the use of his hands and arms. Evidence was also presented that L.S. will need medical care in the future for his conditions and

16

psychological health, and Smith testified that Mother would not be able to meet those needs. This testimony is supported by Mother's own testimony as to her inability to recall L.S.'s doctor and her ambivalence toward his medical care as. Mother failed to demonstrate an ability to provide L.S. with the necessary medical care and developmental care necessary for his development. *See In re M.A.A.*, 2021 WL 1134308, at *27–28 ("The record shows that the children need a higher level of care than mother has shown herself able to provide to the children."). Based on this evidence, the trial court could have reasonably concluded that Mother would continue to ignore L.S.'s medical needs in the future if he was returned to her. *See In re L.G.R.*, 498 S.W.3d at 205–06; *In re K.L.*, No. 14-22-00568-CV, 2022 WL 17844266, at *12 (Tex. App.—Houston [14th Dist.] Dec. 22, 2022, no pet. h.) (mem. op.); *In re M.A.A.*, 2021 WL 1134308, at *23.

Further, there is ample evidence that foster mother has been attentive and diligent in seeking medical care for L.S.; that L.S. is thriving under foster mother's care; and that L.S. has significantly improved after being removed from Mother's care and placed with foster mother. *See In re M.T.*, No. 14-22-00198-CV, 2022 WL 3204819, at *9 (Tex. App.—Houston [14th Dist.] Aug. 9, 2022, no pet.) (mem. op.); *In re M.A.A.*, 2021 WL 1134308, at *21; *In re L.M.N.*, No. 01-18-00413-CV, 2018 WL 5831672, at *20 (Tex. App.—Houston [1st Dist.] Nov. 8, 2018, pet. denied) (mem. op.). Additionally, evidence was presented that L.S. was not enrolled in school and could not count, read, write, communicate, or perform arithmetic at the time he was placed into the Department's care. Under foster mother's care, L.S. significantly improved in all these areas, and foster mother "took it upon herself to get private tutoring" for L.S., in addition to the tutoring services provided by the Department. Smith and foster mother testified that L.S. now is outgoing, well bonded with his foster siblings, attending therapy, is medicated, getting the medical

procedures needed, and thriving in school and at home. *See In re K.L.*, 2022 WL 17844266, at *12. Based on this evidence, the trial court could have formed a firm belief or conviction that Mother's failure to enroll L.S. in school or teach him to read or do math and that foster mother's care for L.S.'s physical and emotional needs weighed in favor of terminating Mother's parental rights. *See In re P.N.T.*, 580 S.w.3d 331, 358 (Tex. App.—Houston [14th Dist.] 2019, pet. denied); *Yonko v. Dep't of Fam. & Protective Servs.*, 196 S.W.3d 236, 243–44 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

A child also needs a safe and stable home. *In re T.S.*, 2022 WL 4474277, at *21; *see* Tex. Fam. Code Ann. § 263.307(a) (providing that prompt and permanent placement of child in a safe environment is presumed to be in the child's best interest); *In re G.M.G.*, 444 S.W.3d 46, 60 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("A parent who lacks stability, income, and a home is unable to provide for a child's emotional and physical needs."). The evidence in the record indicates that Mother depends on Muhammad for bills and access to a home, a person with whom she has had a turbulent and physical relationship that has led to her arrest and a criminal charge. There was evidence that Mother negligently supervised L.S. multiple times, including an instance when the Fire Department had to break down the apartment door because Mother was intoxicated and screaming, while L.S. was present. There is also evidence that Mother argued with Muhammad at home and twice brandished a deadly weapon, a knife, while L.S. was at home. The trial court could reasonably infer that L.S. would continue to live in an unsafe and unstable home if allowed to return to Mother and that Mother's poor choices and violent behavior, and conduct of a potentially criminal nature will continue, endangering L.S. present and future physical and emotional needs. *See In re L.G.*, No. 14-22-00335-CV, 2022 WL 11572541, at *12 (Tex. App.—Houston [14th Dist.] Oct. 20,

2022, no pet.) (mem. op.).

A parent's performance under a service plan is also relevant to the emotional and physical danger to the child now and in the future. *S.L. v. Dep't of Fam. & Protective Servs.*, No. 14-22-00194-CV, 2022 WL 4103250, at *8 (Tex. App.—Houston [14th Dist.] Sept. 8, 2022, pet. denied) (mem. op.) ("Given the connection between a service plan and the *Holley* and statutory factors, a parent's actions with regard to the service plan are relevant to a child's best interest."); *see also In re M.G.D.*, 108 S.W.3d 508, 515 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) ("[W]e believe a parent's turnaround and compliance with a family service plan are factors [to] consider, but not determinative ones. If the facts involved show progress may take a very long time [, then] reasonable jurors may conclude that termination is clearly and convincingly in the child's best interest."). While Mother made progress on some of the requirements of her service plan, she crucially failed to complete therapy and anger management and provide proof of employment.

Finally, Smith testified that Mother tried to force feed L.S. during visitations and that she removed his clothing with scissors, which caused L.S. to be upset. Additionally, there was evidence that Mother's visitations resulted in L.S. having negative outbursts and wetting the bed. The trial court reasonably could conclude that this pattern of behavior was damaging to L.S.'s emotional needs and would continue in the future. *See In re L.G.R.*, 498 S.W.3d at 205–06; *In re K.L.*, 2022 WL 17844266, at *12; *In re M.A.A.*, 2021 WL 1134308, at *23.

> **3. Parental abilities of the individuals seeking custody; programs available to assist those individuals seeking custody to promote the best interest of the child; plans for the child by the parties seeking custody; stability of the home or proposed placement; acts or omissions that indicate the parent-child relationship is not appropriate**

Here, the evidence showed that there are programs available to help Mother

improve her parenting abilities, such as counseling and parenting classes, but that Mother's access to these programs is limited and hindered due to her need for an interpreter. Additionally, the testimony at the final hearing reflected that Mother could not recall the classes she had attended.

Mother's work history and lack of stable income indicates that there is a real danger that Mother would subject L.S. to a life of instability and would struggle to meet L.S.'s basic needs. Mother did not work "a whole lot" but only "sometimes" and "part time" and testified that she would "[s]ometimes . . . clean homes." Mother stated that she earned "a little bit over $300" per month; she spent around $200 on L.S. a month; and acquaintances would help her if she could not provide for L.S. Muhammed testified that he was paying the bills and providing a home for Mother and L.S., and Mother would struggle to meet L.S.'s basic needs if Muhammed decided to stop assisting her.

Conversely, the testimony of Smith and foster mother shows that foster mother provides a stable home for L.S. and that L.S. was bonding with his foster family, although evidence was presented that L.S. became physical with other children after visits with Mother, and there was an unspecified allegation of inappropriate touching. Foster mother was attentive to L.S.'s physical and emotional needs; she attended to L.S.'s medical, psychological, and educational needs; took L.S. to counseling; sought speech therapy, physical therapy, and consultations with specialists; and obtained surgery for L.S. to improve his quality of life.

### 4. Any excuse for the parent's acts or omissions

Evidence was presented that Mother's inability to complete certain requirements of her service plan was due to her limited knowledge of the English language and the difficulty of finding an interpreter in her native tongue. However, this does not override or excuse the other shortcomings and failures of Mother in

20

caring for L.S. and L.S.'s best interest. *See In re F.M.E.A.F.*, 572 S.W.3d at 732.

### 5. Balancing of the factors supports termination

Even viewing the evidence in the light most favorable to Mother, we can only conclude that she is unable to overcome the neglect and danger L.S. was subjected to under her care, the instability of the home and her inability to provide financially for L.S., and her aggressive and physical behavior towards L.S. and Muhammad. *See In re L.G.*, 2022 WL 11572541, at *12. Considering the entire record, we conclude that the evidence is legally and factually sufficient to support the trial court's finding that termination of Mother's parental rights was in L.S.'s best interest. *See In re A.M.*, 495 S.W.3d 573, 581–82 (Tex. App.—Houston [1st Dist.] 2016, pet. denied); *Brantmeier v. Brazoria Protective Servs. Unit, Tex. Dep't of Human Res.*, 661 S.W.2d 234, 236 (Tex. App.—Houston [1st Dist.] 1983, no writ).

Mother argues on appeal that she is L.S.'s only connection to his Ethiopian heritage. However, as noted above, the record shows that foster mother took steps and made plans to keep L.S.'s Ethiopian heritage a part of his life. We cannot conclude that the consideration of L.S.'s heritage through his Mother overrides or outweighs the evidence of danger to L.S. *See In re J.W.*, 645 S.W.3d at 746; *Holley*, 544 S.W.2d at 371–72; *In re F.M.E.A.F.*, 572 S.W.3d at 732.

We overrule Mother's sole issue.

21

### III. CONCLUSION

The trial court's order is affirmed.



          /s/     Margaret "Meg" Poissant


Panel consists of Justices Wise, Poissant, and Wilson.